**NATIONAL LIME ASSOCIATION,**
Petitioner,

v.

**ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle, Administrator of Environmental Protection Agency.**

No. 78–1385.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 11, 1979.

Decided May 19, 1980.

Arthur A. March, Englewood, Colo., a member of the bar of the Supreme Court of Connecticut *pro hac vice* by special leave of court with whom Henry W. Leeds, Washington, D. C., was on the brief, for petitioner.

Earl Salo, Atty., EPA, Washington, D. C., with whom Joan Z. Bernstein, Gen. Counsel,

EPA, James W. Moorman, Asst. Atty. Gen., Angus MacBeth and Raymond W. Mushal, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

Before TAMM and WALD, Circuit Judges, and GREENE *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

■ The National Lime Association (NLA), representing ninety percent of this country's commercial producers of lime and lime hydrate (the industry), challenges the new source performance standards (NSPS) for lime manufacturing plants issued by the Environmental Protection Agency (EPA, Administrator or Agency) under § 111 of the Clean Air Act (the Act), 42 U.S.C. § 7411 (Supp. I 1977). The standards limit the mass of particulate that may be emitted in the exhaust gas from all lime-hydrating and from certain lime-manufacturing facilities and limit the permitted visibility of exhaust gas emissions from some facilities manufacturing lime. We find inadequate support in the administrative record for the standards promulgated and therefore remand to the Administrator.

## I. RELEVANT PARTICULARS OF THE LIMESTONE INDUSTRY

### A. The Industry

In sheer size and weight of production, the limestone industry ranks among the largest in this country. Limestone production in the United States ranks second only to sand and gravel in commodity tonnage and exceeds petroleum, coal and iron ore in volume produced. Limestone deposits can be found beneath an estimated fifteen to twenty percent of the surface of the United States and occur in every state. Total national production approximates twenty-two million tons annually and derives from plants in over forty states.[1]

The recent development of two important industrial uses for lime[2] has ensured the continuing growth of production[3] despite a decline in agricultural use.[4] The industry is capital-intensive with declining employment, but because so many other industrial processes depend on the use of lime, any decline in production would have "a large multiplier effect on U.S. employment."[5]

### B. The Production of Lime From Limestone

The process by which commercially valuable lime is produced is relatively simple. Limestone is quarried, crushed, sized and fed into a kiln where it is subjected to high temperatures ($1100°C/2000°F$). By a proc-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The foregoing production figures describe the lime industry as of 1975. I EPA, Standards Support and Environmental Impact Statement: Proposed Standards of Performance for Lime Manufacturing Plants, Record Document No. (R.) 125, also R. 161, 3–1, 7–1—7–4 (1977) [hereinafter cited as SSEIS].

2. The basic oxygen furnace, in which lime is used as a steel flux, has gained widespread acceptance in the steel industry, Midwest Research Institute, Environmental Impact Statement for Lime Plants, R. 8, 36 (May 1976) [hereinafter cited as MRI Report]. In addition, "[l]ime is the world's leading reagent for use in the treatment of both water and air pollution." SSEIS 3–1. The MRI Report notes: "The potential stack-gas control market in utilities is larger than all other current lime markets in the United States. . . . " Id. at 37. Sulfur

dioxide is a primary pollutant produced by the burning of oil and coal and, uncontrolled, is emitted in large quantities through the smokestacks of large consumers of oil and gas, e. g., public utilities. It is an acidic substance whose acidity can be neutralized by interaction with lime, an alkaline substance. See [1974] EPA Ann.Rep., S.Doc. No. 122, 93rd Cong., 2d Sess. V–8—V–9 (describing flue gas desulfurization processes using alkaline substances such as lime). This interaction in fact occurs in the stack effluent from coal and oil-fired lime kilns. See note 27, infra.

3. EPA projected an annual growth rate of five percent over the next ten years. SSEIS 3–1— 3–2; id. 8–1.

4. MRI Report 32.

5. SSEIS 3–2.

ess known as "calcination," the heating ("burning") of limestone produces quicklime, a soft, porous, highly reactive material commonly used in industry. As might be expected, the process generates a substantial quantity of dust, or in the language of the Agency, particulate matter, sufficiently lightweight to be carried off in the hot exhaust gas and emitted from the kiln. The particulate matter thus released is composed of partially burned limestone, raw limestone feed, deadburned lime[6] and quicklime. Typically, the process also releases sulfur dioxide $(SO_2)$.[7]

Almost ninety percent of total United States lime production is processed in rotary kilns.[8] Uncontrolled emissions from rotary kilns have been reported to run from 150 to 200 pounds per ton of lime produced, roughly five percent of the feed poundage and nine percent of the produce.[9] A typical lime plant[10] producing 500 tons per day from a rotary kiln, conforming to typical state pollution-control standards,[11] emits about 150 megagrams (165 tons) of particulate matter per year. Rotary kilns produce a greater volume of particulate emissions than the formerly widely used vertical kilns but they are also the only kilns which can retain product quality while burning coal, a fuel on which the industry has become increasingly dependent.[12]

6. "Deadburned lime" is the product of overburning quicklime.

7. Sulfur is found in most limestone and in all fuels used in calcination, except natural gas. SSEIS 3–9. However,

> [t]he sulfur in the limestone feed does not normally contribute to a substantial portion of the total $SO_2$ emissions from a rotary kiln . . . . The major concern with respect to $SO_2$ emissions from rotary kilns is the sulfur content of the fuel.

*Id.*

Other exhaust emissions resulting from the processing of lime and limestone include carbon monoxide and nitrogen oxides. SSEIS 8–4.

8. Rotary kilns are cylindrical furnaces which rotate at a slight inclination from the horizontal. Limestone is fed into the elevated end of a rotating kiln and discharged at the lower end as quicklime. Stone sizes fed into the kiln range from ¼" to 2½". Depending on the feed size and the temperature and duration of calcination, a wide range of lime qualities can be achieved in the kiln: coarse or uniform, unreactive or highly active. (Internal mixers are used in some kilns to insure uniformity of product but the use of such mixers results in higher dust loads in the exit gas.) Short rotary kilns have more limited feed size requirements (⅜" to 1¾") than long rotary kilns. The generally larger feed size results in lower dusting in shorter kilns. SSEIS 3–14.

9. MRI Report 2. The MRI Report appears to refer only to particulate emissions. Taken as a description of average industry "dustiness" the figures were disputed by the NLA. EPA's response was to alter the model plant profile. The average dusting rate was ultimately assumed to be 17% of lime produced. SSEIS 3–10. *See* discussion *ante*, text at notes 71–72.

10. For purposes of determining the impact of various control options, EPA posited a "model plant" producing 500 tons per day from 1000 tons of feed stone. The model plant operates 330 days per year, uses 130 tons of coal a day and 32 kilowatt-hours of electric power per ton of lime, has an average dusting rate of 17% of lime produced, potentially produces 200 to 650 pounds per hour of $SO_2$, depending on the sulfur content of the coal, 60 pounds per hour of nitrogen oxides and 20 pounds per hour of carbon monoxide. SSEIS 3–10.

11. Typical state standards for lime plants require control of particulate emissions from lime kilns to 0.5 kilogram per megagram of feed (1.0 pound per ton) and control of sulfur dioxide to 1.0 kilogram per megagram (2.0 pounds per ton). SSEIS 8–1.

12. SSEIS 3–5. Low sulfur coal supplies are dwindling; EPA estimates that by 1986, 50% of new plant capacity will be using high sulfur coal. SSEIS 3–5.

The increased use of coal, particularly high sulfur coal, can be expected to affect emissions. Use of high sulfur coal can result in "significant" $SO_2$ emissions; EPA projects 84 pounds per hour of $SO_2$ when 3.5% sulfur coal is burned in a "model" kiln producing 500 tons of lime per day. SSEIS 3–9—3–11. This compares with approximately 22 pounds per hour of $SO_2$ when low sulfur coal (one percent or less) is burned. The chemical composition of the limestone feed, the kiln temperature, the amount of excess oxygen in the kiln, and the amount of dust and particle size will all affect $SO_2$ emissions, but the major factor will be the sulfur content of the fuel. SSEIS 3–9.

The standards at issue here, however, expressly limit only particulate emissions. No standard has been set for emissions of sulfur dioxide in the lime industry.

### C. The Production of Hydrated Lime

A comparatively small amount (ten percent) of all lime produced is further processed into hydrated or slaked lime. This is done by adding water to lime and introducing the mixture into an agitated hydrator. An exothermic reaction occurs and a fluffy, dry, white powder, known as hydrated lime, is the result.[13] Particulate matter is carried off in the steamy exhaust emitted from the hydration process.

### D. Emissions Control in the Production of Lime

Rotary kilns here and abroad have employed several different methods of emissions controls including the fabric filter baghouse, the electrostatic precipitator (ESP), the high energy scrubber, and the gravel bed filter.[14] One survey showed that of eighty-five domestic rotary kilns, twenty-four percent used a baghouse, thirty-one percent used a high energy scrubber and eight percent used an ESP.[15] However, use of the baghouse method is increasing because this method requires less energy and does not itself create additional problems of pollution control.[16]

EPA has identified baghouses, ESPs and scrubbers as "best systems" of emissions control for rotary lime kilns.[17]

### Baghouses

The operation of baghouses and electrostatic precipitators was briefly explained in our initial review of EPA's performance standards for portland cement plants, *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 390–91 (D.C.Cir. 1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974) [hereinafter cited as *Portland Cement I*]. The baghouse method employs fabric filters ("bags"), situated within an enclosed area (a "house"), to remove particulate from the kiln exhaust gas which is channeled through the house.

As the exhaust gas passes through, a dust cake forms on the filters. The cake itself improves filtration efficiency, but from time to time the filters must be cleaned. This is done by forcing a reverse gas flow through the fabric, thus releasing the cake for disposal.

EPA acknowledges that fabric filter effectiveness is primarily a function of kiln exhaust particle size distribution, fabric type, fabric age and maintenance history.[18]

### Electrostatic Precipitators

Under this method, "dust particles are charged [by discharge electrodes] and pass through an electrical field [collector plates] of the opposite charge, thus causing the dust to be precipitated out of the exhaust gas . . . ." *Portland Cement I*, 486 F.2d at 390. Two basic criteria must be met before an ESP can be utilized: (1) the suspended particle must be able to accept an electric charge; and (2) the particle must then pass through an electric field of sufficient strength to ensure removal of the particulate from the gas stream at the desired efficiency.

Precipitability is a function of the chemical composition of the dust particles, and will vary with the different kinds of material that make up the kiln exhaust dust (limestone, quicklime, fly ash, calcium sulfate, etc.).[19] Assuming precipitability, the two main factors influencing the efficiency of a precipitator are the gas velocity and treatment time. The ESP method experiences a relatively low collection efficiency on submicron particles.

---

13. The "model" hydrator processes 14 tons of lime per hour and produces 17 tons per hour of hydrate, operates 4700 hours per year and produces dust at the rate of 1200 pounds per hour. This model, like the model kiln, was developed for purposes of assessing the "impacts" of each control option considered. SSEIS 3–15.

14. The gravel bed filter was not considered by the EPA as one of the "best systems . . . adequately demonstrated." Apparently it is little used in this country. SSEIS 4–11.

15. MRI Report 8–9.

16. *See* SSEIS 7–27; 8–12.

17. 42 Fed.Reg. 22507 (1977).

18. SSEIS 4–2.

19. SSEIS 4–6.

Although most particles collected by an ESP fall by gravity into waiting hoppers, programmed rapping of the electrodes is also required to keep the collector plates and discharge electrodes clean. As with the baghouse method, the dust collected is dry and may be disposed of in a variety of ways. A high level of maintenance skill is needed to keep an ESP in operation at design conditions.

*Scrubbers*

Scrubbers operate on the principle that wet particles are easier to control than dry. High pressure (or high energy) scrubbers of the type EPA considers capable of meeting the promulgated standards are those which because of their design increase the likelihood of contact between particle and water.

The most common high pressure drop scrubber used for controlling emissions from rotary lime kilns is the venturi scrubber. This scrubber operates by accelerating the velocity of the exhaust gas through a narrow venturi-shaped throat, where it is then brought into contact at great force with a spray of water. The particles thus dampened coalesce to form a slurry that can then be collected by a comparatively simple water-gas separation device. The separated gas is then released into the atmosphere.

The efficiency of particulate removal is a direct function of energy input, measured by pressure drop across the venturi throat.[20] Gas-water contact in the venturi scrubber is so thorough that even submicron particles are removed. Although low pressure drop scrubbers use less energy than high pressure drop scrubbers, even a low efficiency scrubber requires more energy than either the baghouse or the ESP. The slurry which is the by-product of scrubber use is deposited in ponds, where the collected particulate

settles out from the scrubbing water. The "clean" scrubbing water is then reused. Under present law settling ponds must be located so that they do not receive excessive rainwater run-off, causing overflow into local navigable waters.

### E. Emissions Control in the Production of Hydrated Lime

Hydration emissions have been shown to be most effectively controlled by wet scrubbers and they are the *only* system of emission reduction considered by EPA for lime hydrators.[21]

The most common type of scrubber used on lime hydrators is the wetted fan type with centrifugal separation. In this scrubber water is sprayed into the center of a draft fan where it is forced to mix with the exhaust gas. More water is sprayed just after the fan into the duct carrying this gas-water mixture. The dust laden slurry water is then removed from the cleaned gas stream by centrifugal separation and the "scrubbed" gas is then vented to the atmosphere.

Slurry water is returned immediately to the hydrator for reuse; the hydration process requires the addition of water and the captured dust seems to contribute to, rather than interfere with, the production of hydrate. Recycling the slurry water eliminates the settling ponds and waste sludge disposal problems usually associated with particulate scrubbers.

## II. PROCEDURAL HISTORY

Section 111 of the Clean Air Act, formerly 42 U.S.C. § 1857c–6 (1976) (repealed 1977), now 42 U.S.C. § 7411 (Supp. I 1977), authorizes the Administrator to limit the air pollutants that can lawfully be emitted from newly constructed[22] or modified[23]

20. SSEIS 4–9.

21. SSEIS 4–12.

22. A "new source" is defined by the Act to mean:

any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier,

proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.
42 U.S.C. § 7411(a)(2) (Supp. I 1977); 42 U.S.C. § 1857c–6(a)(2) (1976) (repealed 1977) (same).

23. "Modification" of a source is defined to mean:

plants. This the Administrator can do by promulgating new source performance standards requiring new or modified plants to meet standards which can be met through application of the best system of emission reduction (considering costs) which has been "adequately demonstrated." The purpose is to assure that new or modified plants will not create significant new air pollution problems.[24]

On May 3, 1977, EPA added lime manufacturing plants to the list of sources that "may contribute significantly to air pollution which causes or contributes to the endangerment of public health or welfare" pursuant to section 111(b) of the Clean Air Act, 42 U.S.C. § 1857c–6(b)(1)(A) (1976) (repealed 1977).[25] 42 Fed.Reg. 22510 (1977). At the same time, EPA proposed NSPS for lime plants. 42 Fed.Reg. 22506 (1977). The information underlying both actions was contained in the SSEIS.[26]

Although lime plants were determined to be sources of nitrogen oxides, carbon monoxide and sulfur dioxide as well as particulates, standards of performance were proposed and ultimately promulgated only with respect to particulate matter.[27] Furthermore, of the various types of kilns that may be used in the calcination of limestone, only rotary kilns are regulated by the standards.[28]

> any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.
>
> 42 U.S.C. § 7411(a)(4) (Supp. I 1977); 42 U.S.C. § 1857c–6(a)(4) (1976) (repealed 1977) (same). *See* 40 C.F.R. § 60.14 (1979) (governing "modification" of stationary sources).
>
> Conversion of a kiln from natural gas or fuel oil to coal firing may constitute a "modification," triggering application of the NSPS here promulgated. *See* SSEIS 5–3.

**24.** H.R.Rep.No.1146, 91st Cong., 2d Sess. 3 (1970), U.S.Code Cong. & Admin.News 1970, p. 5356.

**25.** As noted, this section was amended in 1977, NSPS may now be promulgated for a given source if "in [the Administrator's] judgment, it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A) (Supp. I 1977).

**26.** *See* note 1, *supra.*

**27.** In its notice of proposed rulemaking, 42 Fed. Reg. 22507 (1977), EPA explained its decision not to propose standards for nitrogen oxides (NOx), carbon monoxide (CO) and sulfur dioxide (SO2):

> NOx emissions from lime kilns are generally emitted in low concentrations of about 200 ppm. NOx emission reductions achievable through combustion modification or other control techniques have not been clearly identified for lime kilns. Standards of performance to reduce these emissions are therefore not being proposed.
>
> CO emissions from lime plants are normally in concentrations of about 100 ppm. Emissions of this magnitude would result in an ambient air concentration of less than one percent of the primary ambient air quality standard under adverse meteorological conditions. The most effective control method for CO, incineration of the off-gasses, would create a severe fuel penalty, while producing very little environmental benefit. Consequently, standards of performance for control of CO emissions from lime kilns are not being proposed.
>
> SO2 emissions from lime kilns are due primarily to the presence of sulfur in the fuel used to fire the kiln. Potential emissions of SO2 from a 907 Mg (1000 ton) per day lime kiln firing a coal of about 3 percent sulfur would amount to about 295 kg (650 pounds) per hour. Due to the reaction between the lime dust and the SO2, however, a significant reduction in SO2 emissions results. When dry particulate control, such as a baghouse or an ESP, is used, SO2 emissions are reduced by about 85–90 percent. This SO2 reduction can be increased to about 95 percent if a venturi scrubber is used for particulate control.

**28.** The SSEIS identifies three other types of kilns in current use by the industry: the vertical kiln; the rotary hearth kiln; and the fluidized bed kiln. SSEIS 3–11—3–13. The focus on rotary kilns was attributed to the widespread use of such kilns in recent years and to the Agency's expectation that the suitability of these kilns to the burning of coal (*see* text at note 12, *supra*) would secure their preeminent place among the kilns used in the industry.

> It is expected that as supplies of natural gas and oil become more expensive or unavailable, all new kilns would be rotary lime kilns designed to burn coal.
>
> SSEIS 8–9 (footnote omitted).

The kiln standards limit emissions[29] to 0.15 kilogram of particulate matter per megagram of limestone feed (0.3 pound per ton) and ten percent "opacity."[30] The owner or operator of an affected facility is required by the regulations to monitor continuously the opacity of emissions. Where the scrubber method[31] is used for control, both the opacity standard[32] and the opacity monitoring requirement are waived, and the pressure drop and liquid supply pressure of the scrubber must be monitored instead.[33]

The standard proposed and promulgated for lime hydrators limits emissions to 0.075 kilogram of particulate matter per megagram of lime feed (0.15 pound per ton). No opacity standard was set.[34] The hydrator standard requires that the electric current and the liquid supply pressure of the scrubbers[35] used to control emissions be monitored continuously.

The standards promulgated for particulate emissions are considerably stricter than the average applicable state regulations already in effect. Plants conforming to the NSPS here would—in the case of rotary kilns—be required to emit less than one-third the particulate permitted under average state regulations and—in the case of hydrators—less than one-sixth the particulate permitted by these regulations. *See* SSEIS 4–15.

■ Evidently, EPA had engaged in a dialogue with the NLA concerning the anticipated NSPS for at least a year before the standards were proposed.[36] After publication of the proposed standards on May 3, 1977,[37] EPA received additional written comments both from the NLA and from others and on June 16, 1977 held a public meeting to "provide[ ] an opportunity for oral presentations and comments on the standards."[38]

**29.** The standards regulate only kiln exhaust effluent. Particulate emissions from "fugitive" sources (*e. g.*, transfer points, screens or loading operations) are not regulated. "Fugitive" sources can account for up to 10% of all particulate emissions. SSEIS 3–16.

**30.** " 'Opacity' means the degree to which emissions reduce the transmission of light and obscure the view of an object in the background." 40 C.F.R. § 60.2(j) (1979). *See* discussion *infra*, text preceding note 100.

**31.** As more fully described *supra*, text preceding note 20, the scrubber method uses a pressurized spray of water to dampen the dust which then, as slurry, can easily be separated in a centrifuge or cyclonic separator from the remaining effluent.

**32.** The regulations do not expressly exempt scrubber-controlled rotary kilns from the opacity standard. However, the preamble to the proposed rules states:

When a scrubber is used for control of the particulate emissions, it is very difficult to accurately read visible emissions because of the steam plume that is present. Due to enforcement difficulties, an opacity standard would not be effective in this case, and EPA is therefore excluding rotary lime kilns controlled with scrubbers from the proposed opacity standard.

42 Fed.Reg. 22508 (1977). *See also* SSEIS 8–22 ("EPA . . . is excluding rotary lime kilns controlled with scrubbers from the proposed opacity standard.")

**33.** Water supply pressure and pressure drop across the venturi throat were both found by EPA relevant to the efficiency of the scrubber method of emissions control. *See* text at note 20, *supra*.

**34.** The production of water vapor in the hydration process, as by the use of the scrubber to control calcination emissions, interferes with opacity measurement. SSEIS 3–14; 42 Fed. Reg. 22508 (1977).

**35.** EPA found that scrubbers are the only method of emissions control customarily used in the hydration process. The SSEIS states: "Hydration emissions have been shown to be most effectively controlled by wet scrubbers, but a baghouse has been used in at least one case." SSEIS 4–12.

**36.** R. 103, Appendix (App.) 60 (letter dated May 26, 1976 from Ziegler of NLA to Goodwin of EPA setting forth "[p]age-by-page technical analysis with comments of the [draft] standards Support Document"). *See also* R. 129, 3 (EPA response to Congressperson's inquiry, showing twelve communications between NLA and EPA between March 1976 and the date of proposal).

**37.** 42 Fed.Reg. 22506 (1977).

**38.** 43 Fed.Reg. 9452 (1978). The meeting, a transcript of which is contained in the record, R. 140, App. 246 *et seq.*, consisted of (a) a formal presentation by the NLA in which dif-

■ Final responses to some of the comments received were issued in a final support statement document in October 1977.[39] The final notice of rulemaking was published March 7, 1978.[40] Except for two minor changes the final standards did not differ from those proposed ten months earlier.[41] A petition for review was timely filed in this court, the exclusive court of review of new source performance standards.[42]

## III. PREVIOUS REVIEW UNDER SECTION 111

■ As amended in 1977, section 111 of the Clean Air Act requires the Administrator to prescribe standards of performance for new statutory sources that reflect

the degree of emission limitation and the percentage reduction achievable through the application of the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, any nonair quality health and environmental impact and energy requirements), the Administrator determines has been adequately demonstrated. . . .

42 U.S.C. § 7411(a) (Supp. I 1977).[43] As the court of exclusive review for NSPS, we

ferent speakers addressed different aspects of the proposed standards; (b) brief comments by representatives of three manufacturers of equipment used in the lime industry; and (c) an acknowledgment by the Agency of the comments and assurance that they would be considered. The meeting was apparently convened and transcribed because an unspecified "court decision in Washington" had noted "that there are some problems with meetings between industry groups or those being regulated and those regulating [. Consequently] we have been instructed to hold this as a sort of open meeting, so that anybody who wants to can participate and listen to the comments, and also to make a complete record of the meeting." R. 140, 3, App. 248. The purpose of a public meeting puzzled the EPA administrator in charge. *Id.* at 78–79, App. 323–24. The oral presentations for the most part merely repeated written comments simultaneously submitted by the industry. Apart from the EPA's acknowledgment and assurance at the close of the meeting that the comments would be considered, no significant interchange took place between the industry and the Agency which was not reflected in the industry's written comments. As conducted, the meeting's purpose does not seem clear. We do not think that the scheduling of a public presentation of this sort was what this court had in mind in *Home Box Office, Inc. v. FCC*, 567 F.2d 9 (D.C.Cir.1977). That decision was critical of Agency practice holding *ex parte*, confidential meetings with individual industry representatives concerning a rule already proposed—a rule in which there was active, competing industry and public interest. *Id.* at 51–59. That decision did *not* require a *pro forma* public meeting, which would not otherwise have been held, merely to reiterate (or preview) publicly available written comments. *But cf.* 42 U.S.C. § 7607(d)(5) (Supp. I 1977) (requiring the Administrator to "give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions" and requiring that a transcript of

any such oral presentation be kept). (For reasons discussed below, note 43, § 7607 does not apply to the standards here promulgated.)

**39.** II EPA, Final Standards Support and Environmental Impact Statement R. 162 (1978) [hereinafter cited as SSEIS II].

**40.** 43 Fed.Reg. 9452 (1978).

**41.** *Id.* The two minor changes were:
(1) the exclusion from the standard of lime production units at kraft pulp mills (subject to a separate standard);
(2) the addition of a testing technique which EPA considered "would more accurately test exhaust gases where high moisture content is a problem."

**42.** *See* 42 U.S.C. § 7607(b)(1) (Supp. I 1977); 42 U.S.C. § 1857h–5(b)(1) (1976) (repealed 1977).

**43.** Before amendment in 1977 the Act's provisions for new source performance standards were somewhat differently worded. Insofar as they are relevant here the 1977 changes were these:
(1) The Amendments require a standard achievable under the best *technological* system of emission reduction where the pre-Amendment Act required only the best system.
(2) The Amendments require that the technological system be one of *continuous* emission reduction where the pre-Amendment Act contained no such requirement.
(3) The Amendments expressly require the Administrator to take into account the nonair quality health and environmental impact and energy requirements where previously the Act did not expressly so require.
*Compare* 42 U.S.C. § 7411(a)(1) (Supp. I 1977) with 42 U.S.C. § 1857c–6(a)(1) (1976) (repealed 1977). In addition, the 1977 Amendments re-

have examined section 111 standards on several prior occasions. *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375 (D.C.Cir.1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974) (*Portland Cement I*) (Portland cement plants); *Essex Chemical Corp. v. Ruckelshaus*, 486 F.2d 427 (D.C.Cir.1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974) [hereinafter cited as *Essex Chemical*] (sulfuric acid plants and coal-fired steam generators); *National Asphalt Paving Association v. Train*, 539 F.2d 775 (D.C.Cir.1976) (asphalt concrete plants) [hereinafter cited as *Nat'l Asphalt*]; *Portland Cement Association v. Train*, 513 F.2d 506 (D.C.Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975) [hereinafter cited as *Portland Cement II*].

These decisions, viewed independently, have established a rigorous standard of review under section 111. We have not deviated from the approach applied to the first NSPS to reach this court. In that case, *Portland Cement I*, we acknowledged that

[w]hile we remain diffident in approaching problems of this technical complexity, . . . the necessity to review agency decisions, if it is to be more than a meaningless exercise, requires enough steeping in technical matters to determine whether the agency "has exercised a reasoned discretion." . . . We cannot substitute our judgment for that of the agency, but it is our duty to consider whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." . . . Ultimately, we believe,

quire the promulgation of NSPS with respect to "fossil fuel fired sources" which reflect not only the degree of emission limitation achievable, but also the "percentage reduction" achievable under the best systems. 42 U.S.C. § 7411(a)(1) (Supp. I 1977). H.R.Conf.Rep.No. 564, 95th Cong., 1st Sess. 130 (1977), *reprinted in* 3 Senate Comm. on Environment and Public Works, 95th Cong.2d Sess., A Legislative History of the Clean Air Act Amendments of 1977, at 510 (1978) [hereinafter cited as Legislative History], U.S.Code Cong. & Admin.News 1977, p. 1077.

Except as otherwise expressly provided, the Clean Air Act Amendments of 1977 (the "Amendments") became effective August 7, 1977, the date of enactment. Pub.L.No.95–95, § 406(d), 91 Stat. 797 (1977). The effective date of a new subsection concerning Agency rulemaking procedures, 42 U.S.C. § 7607 (Supp. I 1977), was expressly delayed by the Amendments. *Id.* § 7607(d)(11). *See also* text following note 126, *infra.* But no such delay was provided for the substantive amendments to tne NSPS provisions.

A "savings" clause did perpetuate "rules, regulations, orders, determinations . . . or other actions [already] duly issued, made or taken," Pub.L.No.95–95, § 406(b), 91 Stat. 796 (1977); but as the standards challenged here were not "duly issued" until finally promulgated in March 1978, 43 Fed.Reg. 9452 (1978), the substantive aspects of the finally promulgated standards are governed by the 1977 provisions. *See Alabama Power Co. v. Costle*, No. 78–1006, slip op. at 34 n.79, (D.C.Cir. Dec. 14, 1979).

There is no suggestion in the record that the Agency gave any consideration to the substantive impact of the 1977 Amendments on the

standard it had proposed. We think that the Agency should not be required to withhold the promulgation of a proposed standard while it considers the development of newly authorized and severable aspects of that standard; and we consider the requirement of "percentage reduction" for fossil-fuel fired sources one such severable aspect.

However, with respect to aspects of the 1977 Amendments which may operate at cross-purposes or in fact inconsistently with prior law, we think the Agency's standard should reflect the new law. The new requirements that the standard be achievable by an emission reduction system which is both "technological" and "continuous" are two such aspects to which the Agency ought to have given some consideration before the standard here was finally promulgated. Our concerns in this regard are set forth below, note 54 (systems of continuous emission reduction) and text at note 77 and note 77 (technological systems).

The last new requirement, that the Administrator take into account the nonair quality health and environmental impact and energy requirements, was already a part of the case law developed under section 111. *Portland Cement I*, 486 F.2d at 385. The Administrator did, in fact, take these factors into account in proposing the NSPS for lime plants. SSEIS 6–1–6–30.

This is the first challenge to a new source performance standard since passage of the 1977 Amendments. Consequently, we are surprised that neither party in discussing the applicable standard of law so much as mentioned the fact of this major legislative effort.

that the cause of a clean environment is best served by reasoned decision-making. 486 F.2d at 402 (citations omitted).

■ In *Essex Chemical* we reiterated this concept of the court's role in examining the basis for section 111 standards:

> The judgment of the Administrator is to be weighted against his statutory function and limitations, the record searched to determine if indeed his decisions and reasons therefor are themselves reasoned, and at that point our function terminates. Our expertise is not in setting standards for emission control but in determining if the standards as set are the result of reasoned decisionmaking. Yet even this limited function requires that we foray into the technical world to the extent necessary to ascertain if the Administrator's decision is reasoned. While we must bow to the acknowledged expertise of the Administrator in matters technical we should not automatically succumb thereto, overwhelmed as it were by the utter "scientificity" of the expedition.

486 F.2d at 434. The search for reasoned decisionmaking in a world of technical expertise must continue if judicial review is to have any meaning in the statutory scheme.

Section 111 requires that the emissions control system considered able to meet the standard be "adequately demonstrated" and the standard itself "achievable." 42 U.S.C. § 7411(a) (Supp. I 1977). We have in the past remanded section 111 standards for the "seeming refusal of the agency to respond to what seem to be legitimate problems with the methodology of the [ ] tests," *Portland Cement I*, 486 F.2d at 392; and the limited relevance and reliability of the tests relied upon in support of the standard. *Id.* at 396, 401. In *Essex Chemical* as well as *Portland Cement I* we expressed concern that the standards set might not have been achievable in periods of abnormal operation,

e. g., during the "startup, shutdown and [equipment] malfunction" periods that occur in plant operation; and we remanded for further consideration of this issue. *Portland Cement I* at 398–99; *Essex Chemical*, 486 F.2d at 433. We have also questioned the significance of tests conducted for purposes of standard development under conditions different from those specified by the regulations for enforcement. *Essex Chemical* at 436. In analogous review proceedings under other sections of the Clean Air Act and under the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (1976), this court and other courts have evinced a similarly rigorous approach.[44]

However, we think it serves little purpose to elaborate on the standard of review as applied before we explain how, under the general approach required by statute and our earlier decisions, we have evaluated petitioner's and respondents' contentions.

■ The issue presented here is primarily one of the adequacy of EPA's test data on which the industry standards are based. NLA disagrees with EPA's conclusion that the standards are achievable under the "best technological system of continuous emission reduction which . . . the Administrator determines has been adequately demonstrated." Specifically, NLA claims that the test data underlying the development of the standards do not support the Administrator's conclusion that the promulgated emission levels are in fact "achievable" on a continuous basis. Promulgation of standards based upon inadequate proof of achievability would defy the Administrative Procedure Act's mandate against action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (1976).[45]

---

44. *E. g., Bunker Hill Co. v. EPA*, 572 F.2d 1286 (9th Cir. 1977) (Clean Air Act); *Hooker Chemicals & Plastics Corp. v. Train*, 537 F.2d 620 (2d Cir. 1976) (Federal Water Pollution Control Act Amendments of 1972); *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615 (D.C.Cir.1973) (Clean Air Act).

45. The "arbitrary and capricious" standard was expressly adopted as the standard of judicial review of, *inter alia*, NSPS under the 1977 Amendments to the Clean Air Act. 42 U.S.C. § 7607 (Supp. I 1977). For reasons noted *supra*, note 43, we do not apply § 7607 as amended in 1977 to the proceedings here.

## IV. ASSESSMENT OF THE OBJECTIONS RAISED BY THE INDUSTRY

Our review has led us to conclude that the record does not support the "achievability" of the promulgated standards for the industry as a whole.[46] This conclusion is a cumulative one, resulting from our assessment of the many points raised by the industry at the administrative level and in this court;[47] no one point made is so cogent that remand would necessarily have followed on that basis alone.[48] In the

**46.** An achievable standard need not be one already routinely achieved in the industry. *Essex Chemical*, 486 F.2d at 433–34, *citing Portland Cement I.* But, to be achievable, we think a uniform standard must be capable of being met under most adverse conditions which can reasonably be expected to recur and which are not or cannot be taken into account in determining the "costs" of compliance.

The statutory standard is one of achievability, given costs. Some aspects of "achievability" cannot be divorced from consideration of "costs." Typically one associates "costs" with the capital requirements of new technology. *See e. g., AFL–CIO v. Marshall*, 617 F.2d 636, 659 (D.C.Cir.1979). However, certain "costs" (*e. g.*, frequent systemic shutdown to service emissions control systems or use of feedstock of a certain size or composition in order to meet the new emissions standards) are more intimately intertwined with "achievability" than are the capital costs of new technology. In this case the lime industry attacks the standards as "unachievable." When questioned at oral argument, counsel for petitioner disclaimed any attack upon the expense of implementation, stating that he attacked the achievability of the standard "on any reliably repetitive basis," "because of the very variables in the production of lime." This necessarily asserts that a standard which does not account for certain routine variations in conditions is "unachievable." We agree, where, as here, there is no evidence in the record that the "costs" of adjusting for such routine variations (assuming such adjustments be possible) were considered by the Agency in promulgating its standard.

The EPA has expressly built some flexibility into the enforcement end of the new source performance standards, 40 C.F.R. § 60.8(c) (1979) (relating to startup, shutdown and malfunction) and is vested with a more general enforcement discretion, but the flexibility appropriate to enforcement will not render "achievable" a standard which cannot be achieved on a regular basis, either for the reasons expressly taken into account in compliance determination regulations (here startup, shutdown and malfunction), or otherwise. *Cf. Portland Cement I*, 486 F.2d at 398 n.91 and see discussion *infra* text at notes 111–15. In this connection the Congress' new concern that emissions control systems operate continuously, *see* 42 U.S.C. § 7411(a)(1) (Supp. I 1977) and discussion *infra*, note 54, is pertinent.

Because we remand for the development of a more adequate rationale for the promulgated standards we do not now specify the kinds of variations in conditions—not accounted for in the Agency's cost analysis—which might render a uniform standard "unachievable" or so "unachievable" as to represent an arbitrary or capricious exercise of the Administrator's discretion under the Act.

**47.** A myriad of objections were raised by the industry to the Agency's test methodology, analysis of data and conclusions. Our scrutiny of the record has revealed that some of these objections have merit. Those objections we consider meritorious are incorporated in the analysis that follows. The remainder are not discussed.

**48.** In addition to the points made in connection with the achievability of the standard, NLA disputes EPA's determination that lime manufacturing plants "may contribute significantly to air pollution which causes or contributes to the endangerment of public health or welfare." 42 U.S.C. § 1857c–6(b)(1)(A) (1976) (repealed 1977). (*See* text at note 25, *supra*.)

EPA considers the significant production of particulate emissions itself to cause or contribute to air pollution (which may reasonably be anticipated to endanger public health or welfare). The Agency has made this determination for purposes of establishing national primary and secondary ambient air quality standards under § 109 of the Clean Air Act, now codified at 42 U.S.C. § 7408 (Supp. I 1977), and without regard to the harmful or beneficial effect of the material of which the particulate is composed. 36 Fed.Reg. 1502, 8137, 8138 (1971). When ambient air quality standards for particulate were first proposed, the Agency described some of the health effects of particulate matter:

Particulate matter of technological origin is pervasive in its distribution and is associated with a variety of adverse effects on public health and welfare. Particulate matter in the respiratory tract may produce injury by itself, or it may act in conjunction with gases, altering their sites or their mode of action. Particles cleared from the respiratory tract by transfer to the lymph, blood, or gastro-intestinal tract may produce effects elsewhere in the body.

Detailed information on particulate matter is presented in the document "Air Quality

analysis that follows, common threads will be discerned in our discussions of individual points. Chief among these common threads is a concern that the Agency consider the

representativeness for the industry as a whole of the tested plants on which it relies, at least where its central argument is that the standard *is* achievable because it *has*

> Criteria for Particulate Matter" (NAPCA Publication No. AP–49), which provided a basis for the development of the standards set forth below.

36 Fed.Reg. 1502 (1971). *See generally* II Midwest Research Institute, Particulate Pollutant System Study—Fine Particulate Emissions (Aug. 1, 1971) (on file in EPA library) (health hazards of fine particulate); U.S. Dep't of Health, Education and Welfare, National Air Pollution Control Admin., Air Quality Criteria for Particulate Matter, AP–49 (1969) (health hazards of particulate).

The MRI Report, considered by EPA in developing the proposed standard, observes that lime dust can raise the pH of water bodies. MRI Report 22. However, EPA does not appear to have relied on this effect of the lime emissions in support of its standard. It focused instead on the sheer quantity of dust generated by lime plants. 42 Fed.Reg. 22507 ("A study performed for EPA in 1975 by the Research Corporation of New England ranked the lime industry twenty-fifth on a list of 112 stationary sources categories which are emitters of particulate matter"); SSEIS 8–2 ("In a study performed for EPA by Argonne National Laboratory in 1975, the lime industry ranked seventh on a list of the 56 largest particulate source categories in the U.S.").

The industry's argument rests on the asserted nontoxicity of lime dust.

> In spite of a few expressed opinions, maybe more than a few, that lime dust under certain unspecified conditions might be suspect or might be harmful to the respiratory system, there is overwhelming counter evidence that lime is not toxic or unhealthy, except under extremely concentrated conditions. It is simply a nuisance dust.

R. 139, 18, App. 200. *See also* R. 140, 56, App. 301. NLA argues the innocuousness or even benign effect of lime emissions and concludes that "the statement that lime endangers health should be stricken from this EPA document." R. 139, 19, App. 201. The fact that lime dust reacts with and traps SO2 emissions (*see* notes 2 and 27, *supra*) leads NLA to continue, "A more plausible case could be made that the presence of a low concentration of lime particles in the air could actually be beneficial in minimizing so-called acid rains, neutralizing molecules of airborn acid gases, like SOx and NOx into harmless compounds." R. 139, 19, App. 201.

We think the danger of particulate emissions' effect on health has been sufficiently supported in the Agency's (and its predecessor's) previous determinations to provide a rational basis for the Administrator's finding in this case. *See*

Air Quality Criteria for Particulate Matter, *supra*. Moreover, whatever its impact on public health, we cannot say that a dust "nuisance" has no impact on public welfare. Congress has provided that with respect to the Clean Air Act:

> All language referring to effects on welfare includes, but is not limited to, effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being.

42 U.S.C. § 7602(h) (Supp. I 1977); 42 U.S.C. § 1857h(h) (1976) (repealed 1977) (same). Thus, we could not say that the Administrator's determination is arbitrary, even if the dust were shown innocuous to public health.

The Administrator's assessment of a pollutant's danger to public health or welfare

> involves questions which are "particularly prone to uncertainty," and as a result "the statute accords the [Administrator] flexibility to assess [those] risks and make essentially legislative policy judgments . . . ." *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 541 F.2d 1, 24, 26 (1976), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). These policy choices "are not susceptible to the same type of verification or refutation by reference to the record as are some factual questions," *Industrial Union Department, AFL–CIO v. Hodgson*, 162 U.S.App.D.C. 331, 499 F.2d 467, 475 (1974), and consequently are not subject to review with the "substantive rigor proper for questions of fact," *Ethyl Corp. v. EPA, supra*, 541 F.2d 1 at 24. Instead, our "paramount objective is to see whether the agency, given an essentially legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future." *Automotive Parts & Accessories Ass'n, Inc. v. Boyd*, 132 U.S.App.D.C. 200, 407 F.2d 330, 338 (1968).

*Nat'l Asphalt*, 539 F.2d at 783–84. Our conclusion in *Nat'l Asphalt* is equally applicable here:

> Particulate matter poses enough of a threat to public health to warrant the promulgation of air quality standards—which are aimed at reducing existing levels of particulate matter—and we have no basis on this record to dispute the Administrator's decision that there is a need to prevent further deterioration of "clean air" by establishing additional national standards of performance for particulate matter.

*Id.* at 784.

been achieved (at the tested plants). The Agency's failure to consider the representativeness—along various relevant parameters—of the data relied upon is the primary reason for our remand. The locus of administrative burdens of going forward or of persuasion may shift in the course of a rulemaking proceeding,[49] but we think an initial burden of promulgating and explaining a non-arbitrary, non-capricious rule rests with the Agency and we think that by failing to explain how the standard proposed is achievable under the range of relevant conditions which may affect the emissions to be regulated, the Agency has not satisfied this initial burden.

Bearing this initial burden will involve first, identifying and verifying as relevant or irrelevant specific variable conditions that may contribute substantially to the amount of emissions, or otherwise affect the efficiency of the emissions control systems considered. And second, where test results are relied upon, it should involve the selection or use of test results in a manner which provides some assurance of the achievability of the standard for the industry as a whole, given the range of variable factors found relevant to the standards' achievability.

EPA itself acknowledged in this case that "standards of performance . . . must . . . meet these conditions for *all variations of operating conditions being considered* anywhere in the country." SSEIS 2–6 (emphasis supplied). As set forth in the standards support statement, EPA's guidelines require data to be assessed with consideration of the "representativeness" of the source tested, including the "feedstock, operation, size and age" of the source. SSEIS at 2–7. Furthermore, the record strongly suggests other factors that may affect the particulate emissions from lime plants. Yet at no point does EPA evaluate the relevance or irrelevance of such factors to regulable emissions; nor does the Agency explain how such factors might have been taken into account in choosing test plant sites or in analyzing the data from the sites it chose.

■ The critical question presented here is whether the regulated industry, through its trade association, should have borne the entire burden of demonstrating the unreliability for the industry as a whole of the conclusions drawn by the EPA. In this connection we are candidly troubled by the industry's failure to respond, at a crucial juncture in the standards development process, to the Agency's invitation to submit data supporting a fundamental industry objection to the achievability of the standard.[50] We would have expected the industry to have been eager to supply supporting data for its position, assuming the "cost" of obtaining such data were less than the "cost" of compliance with a standard that was argued to be unachievable on any reliably repetitive basis for the industry as a whole.[51] We cannot help but wonder if the industry's failure to supply such data means that the data available or obtained would not be favorable to the industry's position. Nevertheless we remand because we think, on balance, EPA must affirmatively show that its standard reflects consideration of the range of relevant variables that may affect emissions in different plants.

■ The showing we require does not mean that EPA must perform repeated

---

**49.** *See generally Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d at 642–43; DeLong, *Informal Rulemaking and the Integration of Law and Policy*, 65 Va.L.Rev. 257, 298–301 (1979) (discussing shifting burdens of proof in informal rulemaking). *See also Environmental Defense Fund v. EPA*, 548 F.2d 998, 1013–15 (D.C.Cir. 1976), *cert. denied*, 431 U.S. 925, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977) (Leventhal, J.) (discussing burdens of proof in administrative proceedings).

**50.** The Agency's invitation and the industry's lack of response are discussed *infra*, text following note 87.

**51.** We recognize, of course, that the costs of compliance may be unequally distributed or distributed differently than the costs of obtaining data.

tests on every plant operating within its regulatory jurisdiction.[52] It does, however, mean that due consideration must be given to the possible impact on emissions of recognized variations in operations and some rationale offered for the achievability of the promulgated standard given the tests conducted and the relevant variables identified. To facilitate public comment,[53] we think this rationale should have appeared in the Agency's initial standards support statement.

We must remand to the Agency for a more adequate explanation or, if necessary, for supplementary data to justify the standard in terms of the "representativeness" of the sources tested. The specific doubts generated by our review of the record in light of the lime industry's attack on the standard are more fully explained below.[54]

**52.** It is one thing to generalize from a sample of one when one is the only available sample, or when that one is shown to be representative of the regulated industry along relevant parameters. *See, e. g., Essex Chemical,* 486 F.2d at 438. It is another thing altogether to generalize from an extremely limited sample when a broader sample (both different conditions at the same plant and conditions at different plants) can be readily obtained and when no showing of the representativeness of the sample is made. *See, e. g., Ethyl Corp. v. EPA,* 541 F.2d 1, 38 (D.C.Cir.) (*en banc*), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *Int'l Harvester Co. v. Ruckelshaus,* 478 F.2d at 625, 642.

**53.** *See Portland Cement I,* 486 F.2d at 394: "In order that rule-making proceedings to determine standards be conducted in orderly fashion, information should generally be disclosed as to the basis of a proposed rule at the time of its issuance."

**54.** Our review of the 1977 Clean Air Act Amendments has generated additional doubts. For example, in the development of these NSPS, EPA appears to have given no consideration to the new requirement that NSPS be achievable under systems of *continuous* emission control. 42 U.S.C. § 7411 (Supp. I 1977). *See* note 43, *supra.* Addition of the word "continuous" in 1977 was meant to ban the use of "intermittent" controls. H.R.Rep. No. 294, 95th Cong., 1st Sess. 190 (1977), *reprinted in* 4 Legislative History at 2657. (House intent to ban intermittent control measures for new stationary sources under § 111); H.R.Conf.Rep. No. 564, 95th Cong., 1st Sess. 129 (1977), *reprinted in* 3 Legislative History at 509 (same); *Id.* at 130, 3 Legislative History at 510 (Senate concurrence in House intent). The "intermittent" controls that concerned Congress were any of those which entailed temporary reductions in emissions when weather conditions were poor. H.R.Rep. No. 294, 95th Cong., 1st Sess. 81 (1977), *reprinted in* 4 Legislative History at 2548 (speaking of intermittent controls as those which temporarily reduce or defer emissions when meteorological conditions adversely affect emissions dispersion); *Id.* at 86, 4 Legislative History at 2553 (describing an intermittent control system which reduced the load of a generator during peak pollution periods); *Kennecott Copper Corp. v. Train,* 526 F.2d 1149, 1155 (9th Cir. 1975), cited in H.R.Rep. No. 294, 95th Cong., 1st Sess. 82 (1977), *reprinted in* 4 Legislative History at 2549 (characterizing temporary use of low sulfur fuel during adverse conditions as "intermittent"). But it is not clear that in requiring systems of "continuous" emission reduction the Congress banned only deliberate reductions in emissions when weather conditions were poor.

There are some indications that the 1977 Amendments were intended to prohibit *all* averaging to determine compliance where continuous emission reduction systems were specified. *See* H.R.Rep. No. 294, 95th Cong., 1st Sess. 92, *reprinted in* 4 Legislative History at 2559, U.S.Code Cong. & Admin.News 1977, p. 1170 ("Any emission limitation under the Clean Air Act, therefore must be met on a constant basis, not on an 'averaging' basis . . . . The 'averaging' method is not allowable, precisely because it cannot provide assurances that the emission limitation will be met at all times."); 123 Cong.Rec. H8662, H8664 (daily ed. Aug. 4, 1977) (statement of intent with respect to Conference Committee substitute, referring to NSPS for fossil-fuel fired boilers) ("No averaging in fuel content or in emissions content or levels [will be] allowed in determining whether the prescribed performance standard will be met by a source.").

Whether the 1977 Amendments have effectively repealed the regulations permitting flexibility to account for startups, shutdowns and malfunctions—regulations applauded by this court in *Portland Cement I,* 486 F.2d at 398–99 —is certainly unclear. Such variations, unlike the kinds of "intermittent" reductions which concerned Congress, are less within the industry's control. The impact of the 1977 Amendments on EPA's compliance-testing methodology, which relies on *average* readings both for mass emission and opacity standards, 40 C.F.R. § 60.8(f) (1979); 40 C.F.R. Part 60, App. A, § 2.5 (1979), is equally unclear. It may be that a reasonable construction of the statutory language would leave these regulations intact.

However, we think the perplexing implications of Congress' new requirement of systems of continuous emission reduction should first be addressed by the Administrator and there is

## A. The Particulate Emission Standards

### 1. Rotary Kilns

EPA tested emissions at six plants [55] before it proposed its mass emission standard for rotary lime kilns. These six plants were selected for testing on the basis of visits to thirty-nine plants, during which the visibility of emissions was observed and information obtained on the emissions control systems employed.[56] The thirty-nine plants were themselves selected because they had been identified as effectively controlled after a review of the literature and contact with industry representatives. SSEIS A–1. The results of the tests of one plant (Plant A) which could not meet the proposed standard were excluded from consideration because the plant was thought not to represent best technology.[57] From what we can gather from the record, three plants were able to meet the standard consistently.[58]

Our doubts about the representativeness of the data relied upon are grouped under three subheadings below: *Variations in Quantity of Particulate Generated in the Kiln*; *Variations in Controllability of Particulate Generated*; and *Explanation of Discarded Data from Plants A and F*. Under the subheading *Variations in Quantity of Particulate Generated in the Kiln,* we discuss the possible impact on the standard's achievability of composite dust levels generated by the tested plants and two factors (feedstock variations and gas velocity) that may contribute to composite dust levels. Under the subheading *Variations in Controllability of Particulate Generated,* we discuss two factors—apart from sheer quantity of dust—that may affect emissions control: coal usage and particulate size. Finally under the subheading *Explanation of Discarded Data from Plants A and F,* we discuss the EPA's handling of the results of two tested plants that were unable to meet the standards proposed.

#### a. Variations in Quantity of Particulate Generated in the Kiln

That the quantity of dust produced in the kilns would affect the controllability of emissions and the achievability of the stan-

---

no evidence in the record that the Agency considered or reconsidered its proposed standard in light of this or other aspects of Congressional intent in the 1977 Clean Air Act Amendments.

**55.** The plants are identified in the support statement only by letter. The plants (and the methods of emissions control they employ) are as follows: Plant A (baghouse); Plant B (baghouse); Plant C (ESP); Plant D (ESP); Plant E (baghouse); Plant F (scrubber).

The tests were conducted under EPA's "Method 5" for the measurement of particulate emissions. Method 5 consists of withdrawal of sample emissions by means of a probe inserted into the wall of a smokestack, through which sample emissions are withdrawn by means of a pump set to correspond to the velocity of the air within the stack. 40 C.F.R. Part 60, App. A (1979).

**56.** The six rotary kiln plants selected for testing were those "deemed to employ best systems of emission reduction." SSEIS A–1. This determination was based both on information obtained during the initial visit "on the process and the equipment used to control emissions," *id.*, and on an evaluation of the visibility of emissions. *Id.* That emission visibility factored into the selection of plants for more thorough testing seems clear from EPA's explana-

tion at oral argument of the reasons why Plant A was selected for testing. Counsel for the Agency explained: "I believe . . . that it was reported to the Agency that A was a well-controlled plant and that persons had observed no visible emissions at all from the Plant A stacks, which seemed to be an indication it was well controlled."

**57.** SSEIS 8–17. The Plant A test results and the rationale for their exclusion from consideration are discussed below, text at note 91. One of the five considered (Plant F) was, like Plant A, thought not to represent best technology, 42 Fed.Reg. 22507 (1977), but the results of these tests were presented, if not treated, differently in the Standards Support Statement. *See* SSEIS C–12 (Table C–1 including Plant F data but excluding data from Plant A).

**58.** Plant D did not consistently meet the standard. The Plant F test results did not meet the standard at all. EPA concluded that Plant F, controlled by a low-pressure scrubber, did not represent best technology but that a higher pressure scrubber would be able to meet the proposed standard. 42 Fed.Reg. 22507 (1977). Plant A, excluded from consideration in standard development, was also unable to meet the standard. SSEIS 8–17.

dards does not seem an unreasonable expectation. The Agency, however, appears to have taken conflicting positions on the reasonableness of this expectation and perhaps as a consequence has devoted inadequate attention to several variables which EPA's own documents and the industry suggest may affect the volume of dust produced in different kilns.

#### (1) Feedstock Variations

For example, the record suggests that the size and chemical composition of the limestone feedstock used will affect the amount of dust produced.

■ The MRI Report, prepared for EPA as a prelude to proposal of the particulate emission standards and an important background document considered in developing the proposed standards,[59] stated that "[d]usting in the kiln with the resulting generation of particulate emissions is reportedly a function of the *limestone raw material*, the rate of rotation of the kiln, and the velocity of the gases in the kiln." R. 8, 2 (emphasis supplied). This suggests to us that some analysis should have been performed or tests conducted which took into account significant variations in limestone feed, or other variables relevant to dust generation.

The same theme was struck by NLA's comments on the proposed standard: "No consideration has been given by EPA to variations produced in stone size or preparation, or to the physical characteristics of the stone feed and lime produced, with the resultant variations in the quantity of flue dust to be handled." R. 103, 10.

The EPA did note in its SSEIS that "[r]otary kilns can handle a range of stone feed sizes between ¼ inch and 2½ inches," SSEIS 3–6, and that larger feed size generally results in lower dusting in the kiln. *See* SSEIS 3–14.[60] The Agency also acknowledged that the grade and composition of limestone varies widely across the country. SSEIS 3–1.[61] However, no data on stone size are included by the EPA in the summary data on plants tested (SSEIS App. C) and little information concerning the chemical composition of the feed used at the tested plants is provided. The feedstock at two of the plants tested is characterized as "high calcium lime" (Plants E and F, SSEIS C–6–C–7, and at two other plants as "dolomitic limestone"[62] (Plant C, SSEIS C–3) or "dolomitic stone" (Plant D, SSEIS C–4). The feedstock at one plant (Plant B) is not described at all. We are, more importantly, left in the dark about which kinds of limestone can be expected to produce the greatest volume of emission dust and what, if any, processing adjustments can be expected of producers using particular kinds of feed in order to achieve the standard proposed.[63] For all we know,

---

**59.** The certified index to the record lists eight "EPA Studies or Contract Reports" as "Items Considered in Developing Proposal." Four of these relate primarily to the economics of emissions control. Among these studies and reports, only the MRI Report, the Vulcan Report, *infra* note 60, and to some extent a document prepared by the National Air Pollution Control Administration, titled Study of Technical and Cost Information for Gas Cleaning Equipment in the Lime and Secondary Non-Ferrous Metallurgical Industries, R. 1 (Dec. 31, 1970) [hereinafter cited as Study of Technical and Cost Information] provided the kind of information from which the EPA might have postulated potentially relevant factors in the emission of particulates under various systems of control. Available literature, of course, is another source for such information. *See, e. g.,* R. Boynton, Chemistry and Technology of Lime and Limestone (1966).

**60.** Small feed size is associated with high volume dust generation in another background study on which EPA relies in support of this standard. Vulcan-Cincinnati, Inc., Screening Study for Emissions Characterization From Lime Manufacture, R. 5, 145 (Aug. 30, 1974) [hereinafter cited as Vulcan Report] (commenting on emissions from fluidized bed kilns using small feed size).

**61.** *See also* Vulcan Report at 19.

**62.** "Dolomitic" limestone contains a high proportion of magnesium. R. Boynton, Chemistry and Technology of Lime and Limestone 10 (1966).

**63.** Our purpose in noting the criticisms of the standard made by the NLA is to illustrate the difficulties created by EPA's failure expressly to consider at least in its support statement and possibly at the pre-proposal level both geo-

the six plants tested could be using kinds and sizes of feed which are representative of only a small segment of the industry spectrum.[64] If that were true the plants may not be "representative" and the regulation might not be "achievable" by the industry as a whole.

(2) *Gas Velocity and Operation Levels*

■ According to the MRI Report, quoted above, dust generation is in part a function of *gas velocity* in the kiln. Gas velocity appears in turn to depend on several factors, including the percentage of capacity at which the kiln is operating. The MRI Report stated that kiln gas velocity has "the most [apparent] effect [on dust generation] when the kiln is operated close to 100 percent of design capacity," and noted that in one plant studied an increase in production—from 100% to 135% of design capacity—resulted in double the rate of emissions where a reduction from 100% to 75% resulted in only an eight percent reduction. R. 8, 2–3.[65] This seems to mean that at levels close to or exceeding capacity, gas velocity and consequently dust generation increases at a faster rate than at lower levels of production. Thus the level of capacity at which the plant was operating at the time of sampling and the gas velocity would

appear relevant to the representativeness of the test data.

Both in this court and at the administrative level the industry has addressed the possible atypicality of the production level of some of the test plants, which it alleges were not tested at full capacity[66] and in doing so, it has echoed a concern expressed by this court in an earlier case.[67]

Data on the production level and air flow rate (velocity) at the tested plants were included in the support document filed in this case.[68] These data indicate that the two baghouse-controlled kilns relied upon (Plants B and E) were operating at 111% and 91% of rated capacity, respectively. Plant A, also baghouse-controlled, but whose test results were rejected as unsatisfactory, operated at 92% capacity during the tests. One of the two ESP-controlled kilns (Plant C) was operating at 97% of design capacity and the other (Plant D) was tested at capacity, slightly over capacity, and 86% capacity, but achieved the standard consistently only when operated at less than capacity. The scrubber-controlled kiln, whose test results were discounted in the formulation of the standards, was operated at 95% of design capacity during the tests. Stack effluent flow rate (gas velocity) for the tested plants ranged from a high of

graphic and temporal variations in conditions which might bear on emissions levels. By mentioning feed size, for example, as one variable which might have been considered we do not imply that this factor necessarily bears on the "achievability" of the standard rather than on the costs of its implementation. *See* note 46, *supra*.

**64.** See text at note 71, *infra* (EPA assertion that three of six plants tested generated higher levels of dust than average dust generation in 11 plants for which data were submitted by NLA).

**65.** *See also* Study of Technical and Cost Information 34.

**66.** *E. g.,* letter dated April 22, 1977 from chief chemist at Woodville Lime and Chemical Company to EPA, R. 316, App. 174.

Unfortunately, the industry did not make clear whether it was more concerned with the validity of the test results—which because of the difficulties in accurate measurement under such conditions may be questionable—or with EPA's reliance on less than capacity results,

even if valid, to project an "achievable" standard for capacity operations.

**67.** *Essex Chemical,* 486 F.2d at 436. (The regulations there in question, however, unlike those here, expressly required performance tests while the affected facility operated at the maximum pollutant-production rate.) The regulations governing performance tests now specify testing "under such conditions as the Administrator shall specify to the plant operator based on representative performance of the affected facility." 40 C.F.R. § 60.8(c) (1979).

Like "feedstock," "operation" was listed by the EPA as one criterion of "representativeness" for which data on emissions are assessed before standards are proposed. SSEIS 207. We take consideration of the "representativeness" of operation to include consideration of the percentage of capacity of operation.

**68.** Figures for percentage of rated capacity and air flow rate measurements were provided for each rotary kiln tested for particulate emissions. SSEIS App. C.

438

180,000 ACFM for Plant C to a low of 48,100 ACFM for Plant E.[69]

Having stated that much, however, the Agency did not explain how the range of test results fully takes account of any significant differences in operating conditions in the industry. The support document is totally devoid of analysis of the relevance or irrelevance of operating level or gas velocity to the achievability of the standard, notwithstanding assertions in the EPA's own contracted-for report[70] that gas velocity bears upon dust generation rates.

(3) *Dust Levels at the Tested Plants*

The SSEIS asserts, without explaining how the conclusion was reached, that Kilns A, B and E each generated dust at a rate of twenty-two to twenty-five percent (pounds of dust collected per pound of lime produced),[71] higher rates than the average rate of dust generation at the eleven plants for which data were submitted by the NLA. The NLA data, however, indicate a much greater range in dust generation levels than that suggested by the EPA's test plant figures. R. 103, 13, App. 72 (figures ranging from low of six percent to high of thirty-five percent of lime produced).[72]

As laypersons it seems entirely logical to us to suppose that dust generation levels would directly affect emissions controllability, *viz.*, the higher the dust generation, the more difficult the achievability of the standard by the technological control device.

But the exact relationship between volume of dust generated and the efficiency of the emissions control systems is never clearly stated or explained by the Agency. Instead, the Agency sends us several mixed signals.

On the one hand, the Agency suggests both directly and indirectly that more dust means a more difficult control problem. The direct suggestion is made in the Agency's rationale for the standard, which states that the two baghouse-controlled test kilns generated "higher [dust levels] than the industry reported average *and therefore represent difficult control situations*" SSEIS 8–17 (emphasis supplied). The indirect suggestion is made by the standard itself, which permits higher levels of emissions when larger quantities of feed are being burned, a circumstance under which the production of more dust would be expected.

■ On the other hand, the Agency asserts that the amount of dust generated is irrelevant to the efficiency of at least one control method and therefore to the achievability of the standard. In correspondence with the NLA antedating the standard's proposal, EPA stated,[73] "It is generally accepted that outlet dust concentrations from baghouses vary only slightly with changing inlet dust concentrations." R. 71, 2, App. 57.[74] This statement finds some support in the MRI Report which notes at one point:

69. The flow rate appears to bear a direct relationship to the capacity of the plants, Plant E having a 264 ton per day capacity and Plant C having a much greater capacity, though customarily operated with only two of its three kilns burning.

70. MRI Report, *supra*, note 2.

71. As already noted and discussed below, test results for Plant A were excluded from consideration in proposing the standard.

72. Moreover, we cannot ascertain from the test data contained in the SSEIS how EPA measured uncontrolled dust emissions at its test kilns. In addition, dust generation rates are stated only for the baghouse-controlled kilns for which test results are reported. No dust generation levels are stated for the other three kilns tested for particulate emissions.

73. The SSEIS contains no statement to this effect or data which would suggest this conclusion.

74. The statement relates only to the baghouse method. If the ESP and scrubber do not share with the baghouse this toleration of higher dust concentrations, then it is possible that kilns experiencing higher dust loading than the average would effectively be required to install a baghouse in order to achieve the standard. EPA's operating assumptions, however, were quite different: the Agency assumed that any of the three control methods identified as "best" could be designed to meet the standard.

An incorrect assumption of this sort would not necessarily taint the proceeding, whose purpose is to state an "achievable" standard under *any* "adequately demonstrated" system. However, the incorrect assumption would probably have been reflected in the Agency's

The general opinion among the manufacturers of emissions control equipment was that all four types of control systems would be equally tolerant of process upsets leading to *short-term* heavy dust loadings. In fact, as the dust loadings increase, *within a certain limit*, the emissions removal efficiency of some of the systems will reportedly increase.

R. 8, 10 (emphasis supplied). However, the MRI Report does not indicate whether long term heavy dust loading or extremely heavy short term dust loading would impair the efficiency of the control system; nor does the report indicate what manufacturers consider to be a heavy or short term dust loading; nor does it indicate on what basis the manufacturers' opinion is predicated.[75]

■ Our examination of the record thus yields a conflict: while in one breath EPA appears to acknowledge the relevance of dust generation levels to the proposed standard, in another breath the relevance is denied. In our view, the conflict is not adequately explained, nor is the industry-wide achievability of the standard adequately justified, in light of the acknowledged possibility that heavy dusting creates a more difficult control problem. From what appears in the record, both variations in dust volume produced and its contributing factors received inadequate attention from the Agency in the development and explanation of this standard.[76]

#### b. Variations in Controllability of Particulate Generated

The record points to other variables which were also given short shrift in the stated rationale: the use of coal to fuel the kiln (as it relates to controllability of emissions); and variations in size of emitted particles. The record strongly supports the relevance of coal usage to the efficiency of at least the ESP control method and it also suggests a relationship between particle size and the efficiency of both the ESP and the baghouse control method. Nothing indicates how—if at all—variations in these factors were considered in proposing an "achievable" standard.

#### (1) Coal Usage

It is clear that the trend in the industry is not only toward coal, but toward high sulfur coal, as other energy sources become scarcer. EPA estimates that by 1986, fifty percent of the lime plant new capacity will have high sulfur coal as the only fuel available. SSEIS 3–5. One-half of all coal used will be between one and four percent sulfur content; the average, as high as three percent. SSEIS 6–6. Moreover, conversion to coal is expected to be a major "modification" that will bring old plants into the regulatory orbit under section 111. SSEIS 5–2–5–3, 8–23. Finally, Congress was especially concerned in passing the 1977 Clean Air Act Amendments that the increased use

---

cost analysis, *viz.*, the Agency would have assumed that a broader choice of control methods was available to the industry than in fact was available. To the extent that the cost analysis depends on an incorrect assumption like this one, the rationale for the standard may be flawed. *Cf. Portland Cement I,* 486 F.2d at 396 (noting no substantiation of achievability of standard for kilns employing alternate mode of processing feed) ("We are not here considering a regulation that was issued in the contemplation that all new cement plants will be dry-process . . . .").

75. In a section of the SSEIS dealing with the conversion of plants from the burning of oil or gas to the burning of coal, EPA states, relying on tests conducted at a coal-converted baghouse-controlled rotary *cement* kiln, that "[a] baghouse has proven to be rather insensitive to small changes in the inlet loading." SSEIS 5–3.

No details are supplied and what is meant by "small changes" is unclear.

76. Commenting on the proposed standards, the Department of the Interior noted:

The maximum variations in the dusting rates of some limestones during calcination indicate that some lime plants may find it very difficult to conform to the particulate emission requirements of 0.15 Kg/Mg of limestone feed. We suggest that if it can be demonstrated by the plant operator that a particularly high-dusting limestone is in use, some decrease in the particulate recovery efficiency could be considered.

R. 153, 3 (letter dated July 5, 1977 from Deputy Assistant Secretary of Interior to Goodwin of EPA).

of coal enter into the Agency's regulatory approach.[77]

However, the impact of high sulfur coal usage on the controllability of particulate emissions under any of the three "best" emissions control systems was not clearly or closely examined by EPA in the development of this standard.

With respect to the ESP system, for example, EPA acknowledged that "precipitability [or efficiency of the ESP method] is a function of the chemical composition of the dust particles and will vary with the different kinds of material that make up the kiln exhaust dust (limestone, quicklime, flyash, calcium sulfate, etc.)." SSEIS 4-6. However, neither of the two ESP plants burned coal, the burning of which will affect the chemical composition of the dust and hence the "precipitability" of emissions.[78]

The support document acknowledged:

The tests that were performed on the ESP-controlled kilns are not indicative of normal operation since the current trend in the lime manufacturing industry is toward the use of coal as fuel and the kilns that were tested were fired by oil and natural gas. It is expected that this use of coal would produce a more difficult control problem. However, with proper design of the ESP, it is EPA's judgment that the system could easily meet the level of the proposed standard.

SSEIS 8-12. EPA does not, however, explain the basis for its optimistic judgment that an ESP could meet the standard on a coal burning kiln.[79] Although other factors may affect the chemical composition and hence the precipitability of emissions,[80] EPA's failure adequately to consider the impact of coal usage is a particularly obvious omission.

In still other ways the critical influence of coal, particularly high sulfur coal, was not adequately taken into account. For example, EPA acknowledges that conversion to coal will "cause an increase in particulate emissions in the kiln." SSEIS 5-3.[81] Indeed, three (baghouse-controlled) coal burning kilns were characterized by EPA as "most representative" because they burned coal. SSEIS 8-17. However, of these three "most representative" plants, only two could meet the standard. The insensitivity of the baghouse control method "to small changes in the inlet [dust] loading," SSEIS 5-3,[82] was thought by EPA sufficient to compensate for increased emissions caused by conversion to coal when this method is used, id.,[83] but little attention was devoted to this topic.

In addition, the record reflects little consideration of the impact of variations in the *sulfur* content of coal used. For example, the sulfur content at the coal burning plants tested was considerably smaller than the average projected sulfur content (3 percent) for all new lime plants in the near

**77.** *See* H.R.Rep. No. 294, 95th Cong., 1st Sess. 187, 192 (1977), *reprinted in* 4 Legislative History at 2654, 2659.

**78.** Coal burning adds significant amounts of sulfur dioxide ($SO_2$) to the effluent mix. Much of the $SO_2$ released in lime kilns reacts with the kiln dust, altering the chemical composition of the particulate to be controlled. 42 Fed.Reg. 22507 (1977) (reduction in $SO_2$ emissions due to reaction with lime dust); SSEIS 3-9. Use of high sulfur coal produces more $SO_2$ and might be expected to aggravate the control problems attributable to an alteration in the chemical mix of emissions.

**79.** In fact, elsewhere in the SSEIS EPA states, "The effect of fuel conversion on collection efficiency when an ESP is used to control particulate emissions is not known." *Id.* at 5-3.

**80.** Insofar as appears from the record, no chemical analysis was undertaken of the dust particles generated at any of the test plants— ESP-controlled or otherwise.

**81.** EPA's acknowledgment gives support to an NLA assertion that "coal ash contributes 15 percent to 20 percent to the flue dust generated in a rotary kiln." R. 139, 6, App. 188.

**82.** *See* discussion, *supra*, text at notes 71-76 (concerning relevance of dust quantity generated to achievability of standard).

**83.** EPA pointed to a study of a baghouse-controlled rotary *cement* kiln, where conversion to coal resulted in no increase in controlled emissions. SSEIS 5-3. No details of the study are supplied.

future. Plant B used 0.6 percent sulfur coal and Plant E used 0.92 percent sulfur coal. Plant F (which failed) used 1.86 percent sulfur coal and Plant A (which also failed) used 1.3 percent.

It is certainly plausible that the use of high sulfur coal will result in a greater increase in uncontrolled or difficult-to-control particulate emissions. (The standards support statement suggests that sulfur content may affect particulate weight. SSEIS D–7.) Yet EPA did not state whether the one coal-converted plant which showed no increase in controlled emissions used high or low sulfur coal.

These little bits of information about the impact of coal usage on the controllability of particulate emissions are left for us to piece together. This obvious and important trend at least deserves to be discussed in a coherent fashion.

█ Given the high emphasis in the 1977 Clean Air Act Amendments on coal—especially high sulfur coal—as the fuel of choice,[84] we think the effect on emissions of this fuel's use should have been specifically examined and a rationale offered to demonstrate the standard's "achievability"—under *any* of the best methods of emissions control—when high sulfur coal is burned.

### (2) *Particle Size*

█ Although there is (a) considerable evidence in the record that the efficiency of available control technology varies with emitted particle size and (b) that lime dust particle size varies regionally (probably due to feedstock variation), the EPA (c) undertook no analysis of the impact of particle size distribution on the achievability of its standard. Each of these points is discussed under separate subheadings below.

### (a) *The relationship of particle size to efficiency of control methods*

That particle size affects the efficiency of at least two of the three "best" technological control systems seems clear.

With respect to the baghouse method of emissions control, the support statement itself states that "[f]abric filter effectiveness is primarily a function of kiln exhaust *particle size distribution*, fabric type, fabric age and maintenance history." SSEIS 4–2 (emphasis supplied).[85] Indeed, in response to comments submitted in another case (the asphalt concrete NSPS), EPA recognized that "[p]articulate matter which is spherical in shape, has an average fineness below 5 microns, and is slippery and smooth will decrease the performance of a baghouse . . . ." EPA, Background Information for New Source Performance Standards, EPA 450/2–74–003, 122 (1974).[86]

With respect to the ESP method, EPA acknowledges that ESPs experience a "relatively low collecting efficiency on submicron particles." SSEIS 4–7. Furthermore, EPA has made a similar acknowledgment with respect to both the ESP and the baghouse method on remand from this court's decision in *Portland Cement I*. In a document prepared in response to the remand, EPA stated: "These collectors, fabric filters or electrostatic precipitators, are more effective in removing coarse particles than fine particles." EPA, Response to Remand Ordered by U.S. Court of Appeals for the District of Columbia in *Portland Cement Association v. Ruckelshaus* (486 F.2d 375, [D.C.Cir.] June 29, 1973), EPA 450/2–74–023, 113 (1945) [hereinafter cited as EPA, Response to Remand].

84. In requiring that the standards promulgated reflect only "technological" systems of emission reduction, Congress was in part concerned with withdrawing the regulatory incentive to use naturally "clean" fuels (*e. g.*, gas) to meet emission standards. *See* H.R.Rep. No. 294, 95th Cong., 1st Sess. 188 (1977), *reprinted in* 4 Legislative History at 2655.

85. In addition, shortly after the proposed standards were published the NLA remarked that

baghouses "require . . . coarse particles in order to develop the filter cake [on the interior of the filter screen] necessary for removal of the fine [particles]." R. 103, 11, App. 70.

86. However, the decreased performance on smaller particles may not be very great. The Vulcan Report includes a table showing fabric filter efficiency at 99.8% for five micron particles, declining to 99% for particles measuring one micron. *Id.* at 33.

Thus, it seems likely that both dry-collection methods, the ESP and the baghouse, operate more efficiently when the proportion of large to small particles in the emissions is relatively high. It is therefore possible that a kiln which produces a high proportion of fine particulate may not be able to meet the standard, at least using energy-conserving dry collection methods.[87]

(b) *Regional variations in particle size*

Two early studies on which EPA relies in support of its standard strongly suggest regional or temporal variations in lime particle size. First, the Study of Technical and Cost Information noted: "The size analysis of the [lime] dust being discharged from the kiln may contain as much as 30 percent below 5 microns and 10 percent below 2 microns." R. 1, 35. Second, the Vulcan Report included a table showing that in a typical rotary kiln in Ohio, 12.7% of particulate did not exceed 4.4 microns and 23.8% was smaller than 7.7 microns. *Id.* 20. The report also cautioned that there was "a significant percentage of 'large' particles (larger than thirty-two microns) in this distribution," *id.* 19, and that "the various percentages associated with [ ] particle size distribution . . . may change from state to state depending on the characteristics of the respective limestone deposit." Finally, at an April 30, 1976 meeting between industry and Agency representatives, an industry spokesman made the challenge directly. According to EPA's file memorandum summarizing the meeting, the industry representative

pointed out that there are significant differences between the crystal structures of different limestones. These differences are dependent upon the limestone source and the type of limestone. He stated further that, because of the resulting variations in crystal sizes, particulate emissions could vary greatly from one facility to another (for both the kiln and hydrator). Much discussion of this point followed. Most of the industry repre-

sentatives echoed this argument. They felt that in plants where the lime product had a large crystal structure, meeting the standard would be much easier than in those plants where the lime product had a small crystal structure.

R. 118, 1. The EPA's response at the meeting was noteworthy:

Mr. Goodwin [of EPA] and ISB members stated that they were not aware of these differences and that if the industry would provide EPA with data to back their claim, [the] standard would be reconsidered.

*Id.* At the same meting another industry representative suggested:

[r]elative to the particle size problem, . . . that some type of subcategorization of facilities might be needed. Mr. Goodwin stated that EPA would consider subcategorization if [it] receive[d] adequate evidence to show this need. He also indicated EPA's willingness to do further source testing if the lime industry representatives would suggest places they think [EPA] should test and [sic] [EPA] feel[s] additional testing would be productive.

*Id.*

This promising but aborted exchange dramatically illustrates our dilemma in this case. When particle size was identified as a potentially important variable, both the Agency and the industry failed to pick up the ball.

(c) *EPA's lack of analysis*

As far as we can tell the Agency gathered no data on particle size distribution at the tested plants or in the industry generally, either before or after the industry meeting which focused on this factor. Whether the EPA took particle size into account in developing and promulgating its proposed standard cannot be determined from this record.

87. In discussing the lime hydrator standard, *infra*, we question whether wet scrubbers might not be subject to a similar disability.

Understandably, the Agency's main defense in court centers on the industry's total failure to respond[88] positively to EPA's suggestion that the industry either suggest additional test sites or submit data on the basis of which EPA might reconsider or subcategorize the standard to conform to local variations.[89] EPA's point is a sympathetic one, but not, we think, dispositive. EPA has a statutory duty to promulgate achievable standards. This requires that they approach that task in a systematic manner that identifies relevant variables and ensures that they are taken account of in analyzing test data. EPA's own support document recognizes particle size as a variable but enigmatically does not discuss it at any length or explain its importance in emissions control. That the industry did not assist the Agency in any meaningful way by data or even by suggestions for additional testing is certainly discouraging. But we do not think that inaction—lamentable though it may be—lifted the burden from the Agency of pursuing what appears to be a relevant variable or at the least discussing in its document why it was not considered important.

In this respect, we believe that the industry's comments, concerning particle size distribution, when viewed in light of the material contained in EPA's own support statement and in light of the background documents on which it relied, met a "threshold requirement of materiality,"[90] mandating an Agency response which was not forthcoming here.

#### c. Explanation of discarded Data From Plants A and F

Finally (with respect to the rotary kiln particulate emission standard), a few words should be devoted to the mysterious Plant A and the plant controlled by a low-pressure venturi scrubber (Plant F.). Test results obtained at Plant A were excluded from consideration and those obtained at Plant F were discounted (if not excluded entirely from consideration) in the rationale for the proposed standard. This was because after testing it was concluded these plants did not represent best technology. SSEIS 8–17, 8–18. At both plants the measured particulate emissions had significantly exceeded the proposed standard.[91] The only reason—apart from the poor test result—given for the conclusion that Plant A did not represent best technology was as follows:

The Plant A baghouse is not typical of those in use in the lime industry. Large quantities of dilution air infiltrate through the corrugated asbestos siding and doors into the clean air side of the baghouse. It is unknown how this affects the performance of the baghouse, but this baghouse did not perform as well as the two other baghouses (Plants B and

---

88. EPA also argues that a variety of kilns were able to meet the standard and that therefore no adjustment for particulate size is necessary. Brief for Respondent at 18. We find this argument puzzling and not persuasive; the industry's position had not been that particle size varies with the type of kiln but that it varies with the type of feed.

89. In response to the proposed standards NLA stated:

We have been unable to develop or obtain information that would substantiate the influence particulate size has on collection efficiency, but feel certain that a glass filter bag is more efficient with coarser particulates. R. 139, 8, App. 190. See also R. 140, 38, App. 283 (NLA spokesman orally reiterating this concession).

90. In Portland Cement I, we said:

Manufacturers' comments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern. The comment cannot merely state that a particular mistake was made in a sampling operation; it must show why the mistake was a possible significance in the results of the test.

486 F.2d at 394. See 42 U.S.C. § 7607(d)(6)(B) (Supp. I 1977) (response required to "significant comments"). See also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 553–55, 98 S.Ct. 1197, 1216–17, 55 L.Ed.2d 460 (1978).

91. Plant A averaged 0.23 kilogram per megagram (SSEIS 8–17); Plant F averaged 0.216 kilogram per megagram (id.); the standard proposed was (and the promulgated standard is) 0.15 kilogram per megagram.

E) that were source tested in conjunction with this study.
SSEIS C–69.

■■■ It would appear that EPA's observation of "large quantities of dilution air" at this plant is related to its measurement of high oxygen levels in the effluent.[92] Yet when the oxygen determination at the plant was questioned as "thermodynamically impossible" (R. 139, 7, App. 189), EPA conceded error [93] but offered no other reason to support its conclusion that Plant A did not represent best technology. We think it incumbent upon the Agency, at least where it chooses to propose a standard on a data base as apparently limited as this one, to offer some supportable reason for its conclusion that a tested plant, chosen as likely to be well-controlled, does not represent best technology.[94] The mere fact that its test results were unsatisfactory is not enough.

If, for unexplained reasons, one-third of the test plants initially chosen by EPA for their well-controlled systems fail to meet the standard, the conclusion is just as plausible that the standard is not achievable as that the plants chosen did not have well-controlled systems. It is up to EPA to dispel such doubts, and they have not done so here.

Of course, the fact that Plant A did not meet the proposed standard does not itself prove the standard is unachievable. However, ignoring the Plant A results merely because they were not satisfactory would suggest that the process by which the standard was promulgated was an arbitrary one. This is especially true where the results excluded are those obtained from one of only three plants tested which utilized the existing technology (baghouse) "that approximately 80 percent of the new and modified facilities subject to the proposed standards would use . . . ." SSEIS 8–13.

EPA's handling of the Plant F (scrubber) results does not seem as troubling, primarily because neither the trend in the industry nor this standard favor the use of scrubbers for rotary kilns. It was, however, the only scrubber-controlled plant tested and it did not meet the standard. EPA attributed the poor results to the low pressure employed by the Plant F scrubber and hypothesized that a higher pressure scrubber could meet the standard proposed. In support of this hypothesis EPA relied upon a non-EPA-conducted test reported in the literature, although the conditions under which that test was conducted were not mentioned. SSEIS 8–12. Were the venturi scrubber projected to be in use for any sizable number of new or modified lime plants, we would be considerably less comfortable with the Agency's conclusion that "EPA['s] . . . source test . . . show that all [three control devices] are capable of meeting the particulate emission level of 0.15 kilogram per megagram . . . ." SSEIS 8–12.

#### 2. Hydrators

Since EPA has already agreed to a remand of the standard for "pressure" hydrators, we consider the standard only as it relates to "atmospheric" hydrators.[95]

---

92. "Plant A had the highest emission rate of the six that were tested. The measured oxygen concentration was also highest for this plant." SSEIS 8–17; Id. C–71. In a subsequent test of Plant A conducted by the industry, an effort to reduce air leakage resulted in an O2 measurement of 10%, substantially below the 19.5% figure registered by the EPA and within the range of O2 measurements (7.7% to 14.4%) obtained at the other two baghouse controlled kilns. Controlling for air leakage did not produce a significant reduction in measured emissions. R. 139, 7–8, App. 189–90.

93. "[T]he oxygen data appear to be incorrect." R. 162, 11, App. 351.

94. But cf. Nat'l Asphalt, 539 F.2d at 787 (standard approved where EPA excluded from consideration two out of four industry-conducted tests because Agency concluded plants not well-controlled). ·

95. The process described above, text at note 13, for the production of slaked lime, is that of atmospheric hydrators. Pressure hydrators, as the name implies, differ in that they apply pressure to speed the slaking of dolomitic stone. See generally R. Boynton, Chemistry and Technology of Lime and Limestone, 333–37 (1966).

EPA conducted particulate emission tests on two hydrators,[96] both controlled by wet scrubbers. Each was tested three times.[97] Average emissions at both plants fell below the standard.

However, in reviewing the record in light of the industry's attack, we have encountered the same problem with the hydrator standard as with the rotary kiln standard. There is record evidence substantial enough to raise a real question in our minds whether adequate account was taken of significant variables relevant to the standard's achievability.

Material submitted by the NLA at its June 1977 meeting with EPA suggests that lime hydrators (like rotary kilns) produce particles of different size and surface area.[98]

Since the efficiency of the wet scrubber method of emissions control apparently depends on the probability that dust particles will collide with and be captured by small water droplets which are sprayed into an area through which the effluent must pass,[99] the size and surface area of the particulates to be captured would certainly seem important. Yet the relevance of particulate size and surface area is nowhere addressed by EPA, insofar as this record reveals.

All the record reflects is that both hydrators utilized calcitic (rather than dolomitic) lime, again with no explanation of the relevance of that item of information to the achievability of the proposed standard on an industry-wide basis. Since the comments submitted by NLA in connection with the rotary kiln standard suggest that particle size in calcination is affected by the chemical composition of the material used, a similar effect might therefore be anticipated in the hydration process; but the EPA does not address this possibility either through assumptions, tests performed, data collected and reported, or analysis of results. We are asked to conclude that the projection of an achievable standard for the industry as a whole based on tests conducted at two hydrator plants using calcitic

---

**96.** An additional source was industry-tested and the results, which appear to meet the proposed standard, are summarized in the SSEIS at C–65. The Agency, however, does not rely heavily (if at all) on the results of this test in the promulgation of its standard. Both the SSEIS at 8–18 and the notice of proposed rulemaking, 42 Fed.Reg. 22508 (1977), refer only to the two EPA-conducted tests. It appears that EPA began testing on a third plant but abandoned it when the test conditions (*i. e.*, high gas moisture content) prevented the generation of valid test results. SSEIS D–2.

**97.** The first plant (H–A) was tested once on each of three consecutive days in April 1974. SSEIS C–66. The second plant (H–B) was tested on one day in September 1975 and twice again five days later. *Id.* C–68. The last test on H–B produced the highest emission levels of the six EPA tests, a level in excess of the proposed standard. Tests conducted at a third hydrator facility are included in the summary data for hydrators contained in the SSEIS, *id.* at C–65, but were apparently excluded from consideration in developing the standard because the tests, as noted above, were thought unreliable. *Id.* at D–2.

**98.** The following appears on a page headed "Lime Hydrators" contained in the NLA's formal presentation to the EPA, June 1977:

There is no discussion presented [by the EPA] concerning the type of material being processed [in lime hydrators]. In this regard, we have observed that different types of limestone yield vastly different types of hydrated lime. Also, the type of calcination equipment used to produce the quicklime and the degree to which the quicklime is ground prior to hydration all contribute significantly to the fineness of the resulting hydrated lime. Investigators have observed specific surface of hydrated limes to vary from 5,000 to 110,000 $cm^2/g$ with a geometric weight mean diameter variation between 2.9 and 7.8 microns. These variations do not necessarily correspond to each other. In addition, data from ASTM[2] further substantiates this wide variation of hydrated limes. In a research program nine (9) participating laboratories tested hydrated lime from nineteen (19) sources and found surface area to range from 5,419 to 24,366 $cm^2/g$. It was also found that sieve fineness as determined by percent passing a No. 325 sieve varied from 75.7 to 99.04%.

R. 139, 13, App. 195 (footnotes omitted).

**99.** SSEIS 4–8—4–9, 4–13—4–14.

stone represents a reasoned decision, without knowing why.[100]

Because we remand, the Agency will have the opportunity to consider the hydrator standard more fully in light of the additional material and more elaborate arguments relating to the achievability of the standard for hydrators that were first submitted by the industry when the matter was brought to this court.

**B.** *The Opacity Standard and Continuous Monitoring Requirement*

**1.** *The Opacity Standard*

"Opacity" is defined by regulation to mean "the degree to which emissions reduce the transmission of light and obscure the view of an object in the background." 40 C.F.R. § 60.2(j) (1979). EPA explains that "[t]he opacity level of visible emissions is an indication of the mass concentration of a particular pollutant" and that "[v]arious studies have shown that opacity varies directly with mass concentrations of particulate matter." SSEIS 8–19. EPA considers opacity standards to be "a necessary supplement to particulate mass emission standards" basically because "[o]pacity test methods are quicker, easier to apply, and less costly than concentration/mass tests for particulate matter." SSEIS 8–19.

The performance standards prescribed by EPA for rotary lime kilns consist of both a mass emission standard (grams of particulate emission per gram of feed) and an opacity standard (ten percent). 43 Fed.Reg. 9453 (1978). Only those kilns using dry methods of emissions control are subject to the ten percent opacity standard. As previously noted,[101] no opacity standard was promulgated for lime hydrators (which almost never employ dry control methods) and rotary kilns using wet scrubbers have been exempted[102] from compliance with the opacity standard.

 We have considered the various arguments made by the NLA and conclude that EPA's apparent failure to consider in this case some variables which were (1) given more careful consideration in the promulgation of earlier opacity standards and (2) given inadequate consideration in the companion mass emission standard requires us to remand the opacity standard to the Administrator for additional explanation or for revision.[103]

**a.** *Variables Considered in the Promulgation of Earlier Opacity Standards*

On remand from *Portland Cement I,* 486 F.2d 375, the Administrator undertook extensive reconsideration of both the opacity standard proposed for portland cement plants and the methodology (EPA's "Method 9," 40 C.F.R. Part 60, App. A (1979)) of

**100.** Furthermore, the Agency expressly predicated its standard on an average emissions level which included at least one test where emissions exceeded the proposed standard, Fed.Reg. 22508 (1977); SSEIS 8–18, a possibly questionable basis in light of the 1977 Clean Air Act Amendments' emphasis on systems of continuous emission control. *See* discussion *supra,* note 54.

**101.** *See* note 34, *supra.*

**102.** *See* note 32, *supra.*

**103.** NLA makes a three-pronged attack on the opacity standard. First, it argues the inherent inaccuracy of opacity testing. Second, it points to the discrepancies between the 10% standard promulgated here and the 20% standard promulgated for portland cement and asphalt concrete plants. Third, it notes EPA's failure to abide by its stated methodology in standard-development testing.

Our conclusion to remand the standard derives in part from our examination of the materials drawn to our attention by the industry in connection with the first two prongs of the industry's attack and in part from our conclusion with respect to the mass emission standard above.

We reject the third prong of the industry's attack—EPA's failure to abide by its own "Method 9" in obtaining the test results on which the standard is based. The articles concerning opacity testing submitted by the NLA themselves demonstrate that in most cases the alleged failure to abide by the standards would have had the effect of overestimating rather than underestimating opacity. That is, EPA's mistakes would have laid the basis for a standard which was easier, not harder, to achieve by the industry.

opacity measurement.[104] In the year and a half that followed, the methodology was revised and the standard set for portland cement plants was raised from ten to twenty percent.[105] EPA has explained its relaxation of the portland cement standard as an effort to accommodate the complete range of available data obtained in that case, having adjusted the data for stack diameter. SSEIS II, 13. Stack diameter was thus a variable for which EPA made adjustments in the portland cement case but it was not the only variable considered in formulating that standard. It is clear that the possible impact of other variables were also taken into account on remand, including: particle size and shape, EPA Response to Remand 112;[106] and stack gas exit velocities, id. 116.

The impact of variations in particle size and shape were also considered by EPA in evaluating an opacity standard for asphalt concrete plants.[107] It is this difference in Agency methodology underlying the various new source opacity standards and not the difference in the standards themselves that gives us most pause.[108] No at-

---

**104.** EPA, Response to Remand, 85–125.

**105.** *See* 38 Fed.Reg. 28564 (1973) (opacity standards will not apply to emissions during periods of startup, shutdown and malfunction); 39 Fed.Reg. 39872 (1974) (raising opacity standard from 10% to 20% for portland cement plants, providing some weight may be given in enforcement to discrepant transmissometer readings, adding sort of variance procedure for plants that meet performance but not opacity standards, providing that accuracy of method must be taken into account in enforcement, specifying average of 24 readings at 15 second intervals for enforcement purposes and specifying observer position with respect to both sun and plume).

**106.** In responding to the contentions of the Portland cement industry on remand from *Portland Cement I*, EPA stated a general principle that plume opacity varies with the size of the particles emitted. The industry there argued

> that opacity varies with particle size and shape, so that a given mass concentration of particles—which could be composed of various combinations of different size and shape particles—could result in differing opacities. *EPA agrees that this correctly states the theory of plume transmittance (opacity) as it relates to particle dimensions.*

*Id.* (emphasis supplied). Having conceded this principle, EPA supported its standard as follows:

> In typical high efficiency collector exhaust gases there are generally few particulates larger than 40 microns diameter. The predominant number of particles are between 0.5 and 10 microns with the average size being about 2–4 microns. Maximum light scattering is generally acknowledged to be caused by particles in the size range of 0.2 to 2.0 micron. Available data indicate that the size distribution of particulates released from well controlled cement kilns are similar within a narrow range (approximately 2 to 6 microns) from one kiln to another, and therefore from one plant to another.

What the above data and studies indicate, in short, is that the size of particles emitted by plants with such control equipment varies only within a very narrow range. This variability in average size is theoretically not sufficient to cause more than a ± 5 percent variation in opacity for typical cement kilns. *Id.* at 113 (footnotes omitted).

Variations in particle size were thus considered and found not to warrant a change in the opacity standard. Whether such variations were attributable to different *feed composition* is not clear.

**107.** *See* EPA, Reevaluation of Standards of Performance for Asphalt Concrete Plants 4 (Nov. 1974):

> The opacity standard applicable to asphalt concrete plants has been established at a level (less than 20 percent) such that, taking into account all of the variations in particle size, shape and stack size encountered by asphalt concrete plants, violation of the opacity standard is indicative of a violation of the mass standard.

(The opacity standard for asphalt concrete plants, originally promulgated in March 1974, 39 Fed.Reg. 9307 (1974), was affirmed by this court in *Nat'l Asphalt*, 539 F.2d 775 (1976).)

**108.** That different industries may be subject to different standards and that the Administrator need not bear the burden of explaining those differences is clear.

> [T]he Administrator is not required to present affirmative justifications for different standards in different industries. Inter-industry comparisons of this kind are not generally required, or even productive; and they were not contemplated by Congress in this Act. The essential question is whether the mandated standards can be met by a particular industry for which they are set, and this can typically be decided on the basis of information concerning that industry alone. This is not to say that evidence collected about the functioning of emission devices in one industry may not have implications for another.

tention to particle size and shape appears to have been given by EPA in the preparation of opacity standards for lime plants.[109]

### b. *Variables Inadequately Considered in Mass Emission Standard*

Opacity standards are intended to operate in tandem with mass emission standards, notwithstanding their independent enforceability. Ideally, a violation of an opacity standard should indicate a violation of a mass emission standard. *See* SSEIS 8–19. For this reason the Agency relies on data from the same test plants to support both the opacity and the mass emission standard; but for this reason when the representativeness of data relied upon for one standard is inadequately shown, the representativeness of data relied upon for the other standard is drawn in question.

As discussed above, the Agency failed to consider the representativeness of the particle size produced at its tested plants. This failure is particularly striking in connection with the opacity standard because varia-

tions in particle size have been given careful consideration in the development of earlier opacity standards.

We have already noted that the emissions control systems favored by the standards and by prevailing economic and technological trends may operate more efficiently when the predominant size of particulate emissions is large. As it happens, large particulate is also likely to appear less opaque. Thus, it is possible that a plant would meet both standards only because the particles emitted are uniformly large and we cannot ascertain how the plants tested here "measure up." [110]

### c. *EPA's Arguments*

Both in this court and at the administrative level EPA emphasizes the overwhelming extent to which the plants tested were able to meet the ten percent opacity standard.[111] But without knowing the representativeness of the plants tested or of test conditions, we cannot say that the standard is neither arbitrary nor capricious. Certain-

Certainly such information may bear on technological capability. But there is no requirement of uniformity of specific standards for all industries. The Administrator applied the same general approach, of ascertaining for each industry what was feasible in that industry. It would be unmanageable if, in reviewing the cement standards, the court should have to consider whether or not there was a mistake in the incinerator standard, with all the differences in parties, practice, industry procedures, and record for decision. Of course, the standard for another industry can be attacked, as too generous, and hence arbitrary or unsupported on the record, by those concerned with excessive pollution by that industry. There is, therefore, an avenue of judicial review and correction if the agency does not proceed in good faith to implement its general approach. But this is different from the supposition that a claim to the same specific treatment can be advanced by one who is in neither the same nor a competitive industry.

*Portland Cement I*, 486 F.2d at 389–90.

**109.** EPA contends that NLA did not make such an objection at the administrative level. Brief for Respondent at 28. EPA's contention is refuted by the record. EPA's failure to consider particle size and shape was raised both in connection with the opacity standard, R. 139, 14, App. 196, and in connection with the mass

emission standard. *See* text following note 87, *supra*.

**110.** It is possible that the plants tested here were in effect selected for their large particle size. Thirty-nine plants thought to be "well controlled" were visited by EPA and six were selected from among these for testing because of their low level of visible emissions. As already noted, larger particles produce less visible emissions.

**111.** Of six-minute average readings "normalized" for stack diameter, "[o]ver 67 percent of the six-minute averages were equal to zero and over 82 percent of the averages were less than or equal to five percent opacity. Only 0.4 percent of the normalized averages exceeded 10 percent opacity. The highest single average read was 10.6 percent opacity." SSEIS 8–20; Brief for Respondent at 27. Like EPA, we are puzzled by the NLA's assertion (Brief for Petitioner at 36) that the opacity standard is based on the test results of only one plant. We presume NLA seeks by this assertion to pin the Agency to its final support statement, SSEIS II at 13, where it examines the test results from Plant D (from which the worst readings were obtained). But it is clear that the Agency does not rely on the results obtained from this one plant in support of its standard. SSEIS 8–19—8–20.

ly the fact that virtually all plants tested were able to meet the standard is an important consideration, but our doubts are sufficient, when coupled with our doubts concerning the mass emissions standard (discussed above), to remand to the Agency for amplification of the record.

EPA has committed itself to take the possibility of inaccurate opacity measurement into account in the enforcement of the standard.[112] It has also provided a type of "variance" mechanism under which new sources which meet the mass emission standard but which cannot meet the opacity standard may petition the Administrator to establish a separate opacity standard for that facility. 40 C.F.R. § 60.11(e) (1979), 39 Fed.Reg. 39872 (1974). The variance mechanism, however, seems clearly to have been intended to be narrowly construed.[113]

The Agency relies upon the flexibility built into the regulatory scheme to support the rationality of its standards.[114] The wis-

dom of such flexibility has been applauded on earlier occasions by this court,[115] but the statutory scheme prescribes "achievable" standards and there is a limit to the flexibility with which the Agency is or should be endowed.[116]

We recognize the usefulness of opacity standards as an enforcement tool.[117] Opacity can be monitored by the Agency with little advance warning or costly preparation.[118] We also realize that "[o]pacity standards are not novel . . . opacity standards have been upheld previously by this court [119] under closely analogous circumstances . . . [and that] Congress . . . has expressed concern for opacity values in measuring air pollution under the Clean Air Act. . . . *Alabama Power Co. v. Costle*, No. 78–1006, slip op. at 32, (D.C.Cir. Dec. 17, 1979) (Wilkey, J.), and we do not wish to imply that the Agency cannot justify their use. We remand to the Agency because on this record the reason-

112. Brief for Respondent at 27 n.18; 40 C.F.R. Part 60, App. A (Method 9) (1979): "The accuracy of the method must be taken into account when determining possible violations of applicable opacity standards." The regulations also allow for "excursion" from the standards during periods of startup, shutdown or malfunction. 40 C.F.R. § 60.8(c) (1979).

113. As described when the mechanism was first announced in connection with the portland cement remand:

This provision is intended primarily to apply to cases where a source installs a very large diameter stack which causes the opacity of the emissions to be greater than if a stack of the diameter ordinarily used in the industry were installed. Although this situation is considered to be very unlikely to occur, this provision will accommodate such a situation. The provision could also apply to other situations where for any reason an affected facility could fail to meet opacity standards while meeting mass emission standards, although no such situations are expected to occur. 39 Fed.Reg. 39872–73 (1974).

114. SSEIS 8–19 (referring to the "variance" mechanism); SSEIS II, 13 (referring to enforcement discretion to accommodate method inaccuracy); Brief for Respondent at 27 n.18 (same).

115. *Portland Cement I*, 486 F.2d at 399; *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d at 641.

116. *Portland Cement I*, 486 F.2d at 399 n.91: "Companies must be on notice as to what will constitute a violation. Moreover, an excessively broad theory of enforcement discretion might endanger securing compliance with promulgated standards." Cf. *E. I. duPont de Nemours & Co. v. Train*, 430 U.S. 112, 137–39, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977) (variance authority will not be implied in statutory provision for new source effluent discharge standards under Federal Water Pollution Control Act). *But cf. Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1056–58 (D.C.Cir. 1978) (Agency may handle "upset" conditions for effluent limitations for existing sources under Federal Water Pollution Control Act by exercising enforcement discretion rather than through "excursion" regulations).

117. *Portland Cement I*, 486 F.2d at 400.

118. *See* 39 Fed.Reg. 9309 (1974).

119. *E. g., Portland Cement II*, 513 F.2d at 507, 508–09 (upholding 20% opacity standard against petitioner's arguments that "pollution and plume opacity cannot be reliably correlated and evaluations of the same plume by several qualified observers will vary substantially"); *Nat'l Asphalt*, 539 F.2d at 787 (upholding against challenge to reliability 20% opacity standard for asphalt concrete plants in light of *Portland Cement II's* decision with respect to similar standards).

ableness of the standard has not been demonstrated.

### 2. *Continuous Monitoring*

On the opacity monitoring requirement, the petitioner's argument is simple: there is no adequately demonstrated technology for monitoring opacity.[120] One company operating affected facilities (Dow Chemical) commented, "We have tried several continuous monitoring systems in the past and have been unable to find an instrument that will suitably do the job and can be maintained in operation." R. 148, App. 327–28. The company cited high opacity readings attributable to instrument malfunctioning "as frequently as twice a day" and also remarked that "[t]he opacity readings [of the monitor] do not relate to the actual stack conditions as measured by visual observers."

EPA answers that the continuous monitoring data would not be used to determine compliance with the opacity standard but "to keep a check on the operation and maintenance of the control equipment," and to trigger performance checks by trained observers. Brief for Respondents at 12–13, *citing* SSEIS 8–24 and standard as proposed (42 Fed.Reg. 22506, 22509 (1977)). The Agency argues that if the equipment gives any "indication" of changed opacity it is enough to justify a continuous monitoring requirement. Brief for Respondents at 29. It dismisses the industry's contention that reliable monitoring equipment is not available to perform this limited a function and shifts the burden to the industry to show "by supporting data," SSEIS II, 13, that it is not.

EPA states that it now routinely requires continuous monitoring of opacity in new source performance standards.[121] Brief for Respondents at 14–15. Opacity monitoring was first required and performance specifications for monitoring systems prescribed in connection with the NSPS for fossil-fuel fired steam generators and petroleum refineries.[122] As of the date the lime standard was proposed, five other promulgated NSPS included a requirement for the continuous monitoring of opacity.[123] Since the lime standard's proposal, at least one other standard has been promulgated that contains such a requirement.[124] In answer to NLA's observation that no continuous opacity monitoring is required of portland cement plants, R. 139, 14 App. 196, EPA informs the court that the Agency is now reviewing the portland cement standards pursuant to § 111(b)(1)(B), 42 U.S.C. § 7411(b)(1)(B) (Supp. I 1977) to see if the same requirement should be imposed there. Brief for Respondents at 15.[125]

120. NLA does not take issue with the quite different continuous monitoring requirements for scrubber-controlled systems. Scrubber-controlled systems are monitored not for opacity but for liquid supply pressure and pressure drop in the scrubber. *See* text at note 33, *supra*.

121. Forty C.F.R. § 60.13 (1979) governs continuous monitoring requirements. Performance specifications for continuous monitoring equipment are set forth in Appendix B to 40 C.F.R. Part 60 (1979). EPA explained that in this case:

The visible emissions monitoring systems that are adequate for other stationary sources, such as steam generators, covered by performance specifications contained in Appendix B of 40 C.F.R. [Part] 60 (Federal Register, October 6, 1975) should also be applicable to lime plants, except where condensed moisture is present in the exhaust stream.

SSEIS D–8. Equipment and installation costs for visible emissions monitoring were estimated at $18,000 to $20,000 per site. *Id.* Annual operating costs, including recording of data, were estimated at $8,000 to $9,000 per site. *Id.*

122. 40 Fed.Reg. 46250, 46255, 46256, 46257 (1975).

123. *See* 40 C.F.R. § 60.165(b)(1) (1979) (primary copper smelters); 40 C.F.R. § 60.-175(a)(1) (1979) (primary zinc smelters); 40 C.F.R. § 60.185(a)(1) (1979) (primary lead smelters); 40 C.F.R. § 60.264(a) (1979) (ferroalloy production facilities); 40 C.F.R. § 60.273(a) (1979) (electric arc furnaces in steel mills).

124. *See* 40 C.F.R. § 60.284(a)(1) (1979) (kraft pulp mills). None of these monitoring requirements has been the subject of judicial review.

125. On October 22, 1979, EPA announced an intention to require continuous opacity monitoring at portland cement plants. 44 Fed.Reg.

EPA maintains that it has had considerable experience with the use of continuous monitoring devices and that in its experience a monitor will show if an emissions control device is being properly operated and maintained and the opacity standards met. SSEIS II, 14; SSEIS 8–24. Thus monitoring will act as a needed warning alarm when the control system is out of kilter. SSEIS 8–24.

The industry itself admits there is some value to a continuous monitoring requirement. Dow Chemical took a critical stance (adopted by NLA, Brief for Petitioner at 52) but also acknowledged that monitoring equipment "gives an indication of whether the opacity is increasing or decreasing." R. 148, 2, App. 328. Given this concession, we cannot find the continuous monitoring requirement arbitrary as an adjunct to a non-arbitrary, non-capricious opacity standard. We have today remanded the opacity standard for lime plants. If on remand an opacity standard is retained, EPA may continue to require continuous monitoring.

## V. THE STANDARD OF REVIEW AS APPLIED

Our requirement that the EPA consider the representativeness of the test data relied upon in the development and justification of its standard does not presage any new or more stringent standard of judicial review. The rigorousness of the review in which this court has engaged in previous NSPS decisions—known to some as the "hard look" standard [126]—has already been described.

60761 (1979), but the requirement was not then formally proposed.

**126.** *E. g.*, Rodgers, *A Hard Look at Vermont Yankee: Environmental Law Under Close Scrutiny*, 67 Geo.L.J. 699, 704 (1979) [hereinafter cited as *A Hard Look at Vermont Yankee*]; Breyer, *Vermont Yankee and the Courts' Role in the Nuclear Energy Controversy*, 91 Harv.L.Rev. 1833, 1834 (1978); W. Rodgers, Environmental Law 19 (1977).

The phrase "hard look" derives from Judge Leventhal's opinions in *Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C.Cir. 1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971), and *Pike's Peak Broadcasting Co. v. FCC*, 422 F.2d 671 (D.C.Cir.), *cert. denied*, 395 U.S. 979, 89 S.Ct. 2134, 23 L.Ed.2d 767 (1969). As originally articulated the words "hard look" described the agency's responsibility and not the court's. However, the phrase subsequently evolved to connote the rigorous standard of judicial review applied to increasingly utilized informal rulemaking proceedings or to other decisions made upon less than a full trial-type record. Judge Leventhal himself used the phrase in this sense in *Maryland-Nat'l Capital Park and Planning Comm'n v. United States Postal Serv.*, 487 F.2d 1029, 1037–38 and n.4 (D.C.Cir. 1973).

The etymological evolution of the phrase "hard look" and of other capsule descriptions of standards stated on judicial review of administrative decisions is in no small part attributable to the shifting meaning of "informal rulemaking." The transformation in informal rulemaking proceedings in turn can be traced to the more rigorous standards of review applied.

As originally conceived, "notice and comment" rulemaking provided a scant "record" for review. The statutorily required rationale consisted merely in "a concise general statement of [the rule's] basis and purpose." 5 U.S.C. § 553(c) (1976). The cumbersomeness of rulemaking "on the record" and its attendant delays prompted increased provision for the more flexible and expedient "notice and comment" rules in areas in urgent need of regulation. *See* Pedersen, *Formal Records and Informal Rulemaking*, 85 Yale L.J. 38, 39 (1975) [hereinafter cited as Pedersen].

The sheer massiveness of impact of the urgent regulations issued under the new rulemaking provisions and the diffidence of judges in the face of highly technical regulatory schemes prompted the courts to require the agencies to develop a more complete record and a more clearly articulated rationale to facilitate review for arbitrariness and caprice. *See Kennecott Copper Corp. v. EPA*, 462 F.2d 846, 849–50 (D.C.Cir. 1972) (remand of national secondary ambient air quality standards to EPA for additional rationale); K. Davis, Administrative Law of the Seventies, § 29.01–6 (1976); Stewart, *Vermont Yankee and the Evolution of Administrative Procedure*, 91 Harv.L.Rev. 1805, 1812–13 (1978); Nathanson, *Probing the Mind of the Administrator: Hearing Variations and Standards of Judicial Review Under the Administrative Procedure Act and Other Federal Statutes*, 75 Colum.L.Rev. 721, 746–70 (1975). (Indeed, a section of the Clean Air Act Amendments of 1977 not applicable to the instant proceedings expressly codified much of prior law and the suggestions made in Pedersen concerning the "formalization" of records in informal rulemaking. 42 U.S.C. § 7607(d) (Supp. I 1977); H.R. Rep.No.294, 95th Cong., 1st Sess. 320 (1977), *reprinted in* 4 Legislative History at 2787.)

In enacting the Clean Air Act Amendments of 1977, Congress expressly approved the rigorous standard of review which the courts had theretofore applied to Agency decisions under the Clean Air Act.[127] Although the judicial review provisions of the 1977 Amendments do not apply to this rulemaking proceeding, Congress' express affirmance of the standards already developed fortifies our adherence to the learning of our earlier Clean Air Act decisions in reviewing the new source performance standards currently before us.

We think these decisions amply support our conclusion that a remand is appropriate in this case. Both decisions reviewing the NSPS and those reviewing other administrative determinations under the Clean Air Act evince a concern that variables be accounted for,[128] that the representativeness of test conditions by ascertained,[129] that the validity of tests be assured[130] and

As these newly-required records and rationales became more routinely available, the "hard look" taken began to appear more judicial than administrative, blurring the original meaning of that phrase. The availability for judicial review of substantial administrative records has also generated both confusion and controversy over the applicable standard of review under the Administrative Procedure Act. *See generally* DeLong, *Informal Rulemaking and the Integration of Law and Policy*, 65 Va.L.Rev. 257, 284–89 (1979); Auerbach, *Informal Rulemaking: A Proposed Relationship Between Administrative Procedures and Judicial Review*, 72 Nw.U.L.Rev. 15 (1977); Pedersen, at 46–49.

**127.** H.R.Conf.Rep.No.564, 95th Cong., 1st Sess. 178 (1977), *reprinted in* 3 Legislative History 558, U.S.Code Cong. & Admin.News 1977, p. 1559:

With respect to the "arbitrary and capricious" scope of review retained in these amendments, the conferees intend that the courts continue their thorough, comprehensive review which has characterized judicial proceedings under the Clean Air Act thus far. The conferees also recognized the convergence in practice of the "substantial evidence" and the "arbitrary and capricious" standards of review. *Id.* (reinstating "arbitrary and capricious" standard of review):

In changing the scope of review as contained in the House bill, the conferees were aware that there may be little practical difference between the "substantial evidence" scope of review and the "arbitrary and capricious" scope of review and that the two tests tend to converge as described by recent court decisions. [Referring to *Assoc. Indus. v. Dep't of Labor*, 487 F.2d 342 (2d Cir. 1973)].

**128.** *Ethyl Corp. v. EPA*, 541 F.2d at 25 (*en banc*) (review of regulations under Clean Air Act requiring reduction of lead content of gasoline).

Congress has authorized the Administrator to "distinguish among classes, types and sizes within categories of new sources for the purpose and establishing . . . standards [under § 7411]," 42 U.S.C. § 7411(b)(2) (Supp. I 1977). But the Administrator has not availed himself of the discretion to account for varia-

tions in conditions covered by the standard here. *Compare* the extensive exercise of analogous discretion (with respect to *existing* facilities) under the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (Supp. I 1977). *Weyerhaeuser Co. v. Costle*, 590 F.2d at 1053 (300 pulp and paper plants classified into 16 subcategories and 66 subdivisions, with different limitations for each subdivision). *See also* Judge Leventhal's concurring opinion in *ASARCO, Inc. v. EPA*, 578 F.2d 319, 330 (D.C. Cir. 1978) (noting the Administrator's discretion to classify under § 111 of the Clean Air Act).

**129.** *Portland Cement I*, 486 F.2d at 396 (Agency must explain generalization of standard based on tests of dry-process kilns to wet-process kilns). *Cf. AFL–CIO v. Marshall*, 617 F.2d at 656–657 (D.C. Cir. 1979) (challenge to technical feasibility of OSHA cotton dust regulation upheld where mills meeting the standard ran the "dustiest variety" of cotton); *Weyerhaeuser Co. v. Costle*, 590 F.2d at 1055–60 (D.C. Cir. 1978) (Agency gave adequate consideration to claimed variables in climate and hydraulic flow in establishing effluent limitations under the Federal Water Pollution Control Act). *See Nat'l Asphalt*, 539 F.2d at 786–87 (particulate standard upheld against claim that Agency "ignored a number of variables which should have been taken into account (including variations in the size, shape, and smoothness of particles in the feed ʹaggregate, type of fuel, atmospheric conditions, and start up/shut down [of] plant operations)" when "Administrator's statements indicate an awareness of and a willingness to adjust for such factors"). *See also Ethyl Corp. v. EPA*, 541 F.2d at 38 (only rarely will single study or bit of evidence suffice) ("By its nature, scientific evidence is cumulative: the more supporting, albeit inconclusive, evidence available, the more likely the accuracy of the conclusion."); *Portland Cement I*, 486 F.2d at 396 (significance of single test doubted); *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d at 625 (noting that only one of 384 test vehicles was able to meet the standard).

**130.** *Portland Cement I*, 486 F.2d at 396–97 (use of faulty or discrepant testing procedures "rais-

the statistical significance of results determined.[131] Collectively, these concerns have sometimes been expressed as a need for "reasoned decision-making"[132] and sometimes as a need for adequate "methodology."[133] However expressed, these more substantive concerns have been coupled with a requirement that assumptions be stated,[134] that process be revealed,[135] that the rejection of alternate theories[136] or abandonment of alternate courses of action[137] be explained and that the rationale for the ultimate decision be set forth[138] in a manner which permits the public to exercise its statutory prerogative of comment and the courts to exercise their statutory responsibility upon review. The standard we apply here is neither more rigorous nor more deferential than the standard applied in these earlier cases.

Our opinion should not suggest the necessity of "ninety-five percent certainty"[139] in all the "facts" which enter into the

---

**131.** *Portland Cement I*, 486 F.2d at 396:

"It would . . . seem incumbent on the Administrator to estimate the possible degree of error [inherent] in his prediction,"

*quoting Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d at 647.

**132.** *Portland Cement I*, 486 F.2d at 402; *Ethyl Corp. v. EPA*, 541 F.2d at 35–36 (*citing* several decisions of Judge Leventhal).

**133.** *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d at 632. *See Ethyl Corp. v. EPA*, 541 F.2d at 100 (Tamm, J., dissenting) (using "methodology" in a broader sense).

**134.** *See Int'l Harvester Corp. v. Ruckelshaus*, 478 F.2d at 625 (where test results inconclusive EPA stated assumptions). *Cf. AFL–CIO v. Marshall*, 617 F.2d at 651 (D.C. Cir. 1979) (agency must explicate assumptions underlying predictions or extrapolations); *Portland Cement I*, 486 F.2d at 402 (where EPA relies on tests rather than predictions, it must disclose underlying data and test procedures).

**135.** *Portland Cement I*, 486 F.2d at 393, 400 (data and findings in literature specifically relied upon should be revealed).

**136.** *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d at 651 (Bazelon, J., concurring) ("agency [must] set forth with clarity the grounds for its rejection of opposing views").

**137.** *Cf. Amoco Oil Co. v. EPA*, 501 F.2d 722, 738–39 (D.C. Cir. 1974) (Administrator adequately explained regulatory approach that depended on unavailability of alternative technology).

**138.** *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d at 648 (requiring explanation of assumptions); *Kennecott Copper Corp. v. EPA*, 462 F.2d at 849–50 (requiring more complete rationale). *See Ethyl Corp. v. EPA*, 541 F.2d at 104, 110 (Wilkey, J., dissenting) (Agency decisions must be explained, not merely explainable, *citing Environmental Defense Fund, Inc. v. EPA*, 465 F.2d 528, 539 (D.C. Cir. 1972) (Leventhal, J.).). *See generally A Hard Look at* Vermont Yankee at 706.

**139.** *Ethyl Corp. v. EPA*, 541 F.2d at 28 n. 58:

Petitioners demand sole reliance on *scientific* facts, on evidence that reputable scientific techniques certify as certain. Typically, a scientist will not so certify evidence unless the probability of error, by standard statistical measurement, is less than 5%. That is, scientific fact is at least 95% certain.

Such certainty has never characterized the judicial or the administrative process. It may be that the "beyond a reasonable doubt" standard of criminal law demands 95% certainty. *Cf. McGill v. United States*, 121 U.S. App.D.C. 179, 185 n. 6, 348 F.2d 791, 797 n. 6 (1965). But the standard of ordinary civil litigation, a preponderance of the evidence, demands only 51% certainty. A jury may weigh conflicting evidence and certify as adjudicative (although not scientific) fact that which it believes is more likely than not. Since *Reserve Mining* [*Co. v. EPA*, 514 F.2d 492 (8th Cir. 1975)] was adjudicated in court, this standard applied to the court's fact-finding. Inherently, such a standard is flexible; inherently, it allows the fact-finder to assess risks, to measure probabilities, to make subjective judgments. Nonetheless, the ultimate finding will be treated, at law, as fact and will be affirmed if based on substantial evidence, or, if made by a judge, not clearly erroneous.

The standard before administrative agencies' is no less flexible. Agencies are not limited to scientific fact, to 95% certainties. Rather, they have at least the same fact-finding powers as a jury, particularly when, as here, they are engaged in rule-making.

Looking to the future, and commanded by Congress to make policy, a rule-making agency necessarily deals less with "evidentiary" disputes than with normative conflicts, projections from imperfect data, experiments and simulations, educated predictions, differing assessments of possible risks, and the like.

Agency's decision. We would require only that the Agency provide sufficient data to demonstrate a systematic approach to problems, not that it adduce vast quantities of factual data. However, where the facts pertinent to the standard's feasibility are available and easily discoverable by conventional technical means, there is somewhat less reason for so limited a data base. Nothing in the record suggests the relevant facts are not readily accessible to the Agency; the number of plants is large,[140] use of the control methods found by the Agency to represent the "best systems" is widespread,[141] and stack emission measurement techniques have been known and applied for many years.[142]

■ With respect to the standard's achievability we are thus not presented with the question how much deference is owed a judgment predicated on limited evidence when additional evidence cannot be adduced or adduced in the near future.[143] We do not depart from some of the most carefully considered and closely reasoned decisions of this court which permit an

agency latitude to exercise its discretion in accordance with the remedial purposes of the controlling statute where relevant facts cannot be ascertained or are on the frontiers of scientific inquiry.[144]

■ A systematic approach may not necessarily require a conclusion grounded in actual test results. We do not intend to bridle the Agency's discretion to make well-founded assumptions even where the assumption could be replaced by valid test results, but we think first, the assumption should be stated and second, where test data *could* have verified the assumption, a reason for not testing or relying on such data should be given.

■ We recognize, for example, that the finding of facts, especially through elaborate testing, is costly [145] and the costs of additional testing may be added by the Agency to the costs of delay in issuing the proposed rule and the sum of these costs weighed against the benefit of proposing a rule without additional data.[146]

---

*Amoco Oil Co. v. EPA,* . . . 163 U.S. App.D.C. at 175, 501 F.2d at 735.

**140.** EPA estimated 179 lime plants were operating in 1975. SSEIS 3–1.

**141.** According to the MRI Report, one study showed that 24% of 85 rotary kiln lime plants were controlled by baghouses. *Id.* at 8–9. None of the emissions control systems found by the EPA to be capable of meeting the promulgated standard utilizes a newly developed or little-used technology. All have been widely used in the industry for many years. *See* R. Boynton, Chemistry and Technology of Lime and Limestone 267–68 (1966).

**142.** EPA's "Method 5" was established as a reference method in 1971. 36 Fed.Reg. 24876, 24888 (1971).

**143.** *Cf. Ethyl Corp. v. EPA,* 541 F.2d at 28: Where a statute is precautionary in nature, the evidence difficult to come by, uncertain, or conflicting because it is on the frontiers of scientific knowledge, the regulations designed to protect the public health, and the decision that of an expert administrator, we will not demand rigorous step-by-step proof of cause and effect. Such proof may be impossible to obtain if the precautionary purpose of the statute is to be served. Of course, we are not suggesting that the Ad-

ministrator has the power to act on hunches or wild guesses. *Amoco* makes it quite clear that his conclusions must be rationally justified.
(footnote omitted) (*citing Amoco Oil Co. v. EPA,* 501 F.2d 722 (D.C. Cir. 1974)).

**144.** *Ethyl Corp. v. EPA,* 541 F.2d 1; *Amoco Oil Co. v. EPA,* 501 F.2d at 738–39; *Indus. Union Dep't v. Hodgson,* 499 F.2d 467, 474 (D.C. Cir. 1974). *See generally* McGarity, *Substantive and Procedural Discretion in Administrative Resolution of Science Policy Questions: Regulating Carcinogens in EPA and OSHA,* 67 Geo. L.J. 729 (1979).

**145.** EPA here estimated: "Sampling costs for performing a test consisting of three Method 5 runs [are] estimated to range from $5,000 to $9,000. If in-plant personnel are used to conduct tests, the costs will be somewhat less." SSEIS D–8.

**146.** *Cf. AFL–CIO v. Marshall,* 617 F.2d at 657–658 (D.C. Cir. 1979) (OSHA might have improved quality of record with more extensive studies at different mills and over different periods of time, but OSH Act, although requiring best available evidence, does not require administration to incur these costs).

We leave to the Agency on remand the decision whether additional Agency-conducted testing is appropriate in this case. Data may already be available to the Administrator which would support the achievability of these standards for the industry as a whole. If so, satisfaction of the concerns we have expressed in this opinion may be a fairly simple matter.

To ensure that the Agency has engaged in reasoned decisionmaking, we remand. We have outlined our substantive misgivings; the Agency may choose the appropriate method of response.

*Remanded.*